UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

APL CO. PTE LTD AND AMERICAN                    05 Civ. 3454 (DFE)
PRESIDENT LINES, LTD.,

                        Plaintiffs,

          - against -                           **PLAINTIFFS' PROPOSED
                                                FINDINGS OF FACT AND
BLUE WATER SHIPPING U.S. INC.,                  CONCLUSIONS OF LAW**

                        Defendant.

———————————————————

## General Findings of Fact

      1.    APL Co. Pte Ltd was and is a corporation organized and existing by virtue of the laws of the Republic of Singapore and maintains a principal place of business at 456 Alexander Road #06-00, Singapore 0511, Singapore.

      2.    American President Lines, Ltd. was and is a corporation organized and existing by virtue of the laws of the State of Delaware and maintains a principal place of business at 1111 Broadway, Oakland, California 94607.

      3.    Blue Water Shipping U.S. Inc. was and is a business entity organized and existing under the laws of the State of Delaware and maintains a principal place of business at Wall Street Corporation Center, 27 West Street, Suite #9, Red Bank, New Jersey 07701.

4.    The terms and conditions for bills of lading issued by APL Co.

Pte Ltd and American President Lines, Ltd. (collectively, "APL") include the following:

Clause 1:
'Merchant' includes the Shipper, Consignee, Receiver, Holder of the Bill of Lading, Owner of the cargo or Person entitled to the possession of the cargo or having a present or future interest in the Goods and the servants and agents of any of these, all of whom shall be jointly and severally liable to the Carrier for the payment of all Freight, and for the performance of the obligations of any of them under this Bill of Lading.

Clause 3:
The Merchant warrants that in agreeing to the Terms and Conditions hereof, including the Applicable Tariff(s), it is, or has the authority of, the Person owning or entitled to the possession of the Goods and/or Container and this Bill of Lading . . .

Clause 13(iii):
The Merchant shall comply with all regulations or requirements of customs, port and other authorities, and shall bear and pay all duties, taxes, fines, imposts, expenses or losses (including, without prejudice to the generality of the foregoing, the full return Freight for the Goods if returned, or if on-carried, the full Freight from the Port of Discharge or the amended Place of Delivery) incurred or suffered by reason of any failure to so comply or by reason of any illegal, incorrect or insufficient markup, numbering or addressing of the Goods, and shall indemnify the Carrier in respect of any such failure to comply or by reason of any such marking, numbering or addressing of the Goods.

Clause 14(iii):
. . . All charges due hereunder together with Freight . . . shall be due from and payable on demand by the Merchant (who shall be jointly and severally liable to the Carrier therefore) at such port or place as the Carrier may require, Vessel or cargo lost or not lost from any cause whatsoever.

Clause 21(iii):
If a place of Delivery is named on the face hereof, the Merchant shall take delivery of the Goods within the time provided for in the Carrier's Applicable Tariff. (See Clause 2).

Clause 21(iv):
If the delivery of the Goods is not taken by the Merchant when and where the Carrier is entitled to call upon the Merchant to take delivery thereof, the Carrier shall be entitled, without notice, to unpack the Goods . . . and store the Goods . . . . and the costs of such storage. . . shall forthwith upon demand be paid by the Merchant to the Carrier.

Clause 21(v):
If the Merchant fails to take delivery of the Goods . . . or if in the opinion of the Carrier they are likely to deteriorate, decay, become worthless or incur charges . . ., the Carrier may . . . at the sole risk and expense of the Merchant, sell, destroy or dispose of the Goods . . .

Clause 21(ix):
The Merchant's attention is drawn to the stipulations concerning free storage time and demurrage contained in the Applicable Tariff.

(Exh. 36).


### General Findings of Law

5.      This is an admiralty action as provided in Rule 9(h) of the Federal Rules of Civil Procedure.

6.      This Court has jurisdiction over the subject matter of these claims under 28 U.S.C. § 1333.

## CHICKEN CLAIM

### Findings of Fact

7.     The chicken that forms the basis of the Chicken Claim was owned by Cousins D&N, Inc. ("Cousins").  (Joint Pre-Trial Stipulation of Facts ("Stipulated Facts") at ¶ 1).

8.     During the relevant time, Cousins was splitting into two companies, Astra Group, Inc. ("Astra") and DGM Commodities ("DGM").  Certain Cousins' employees involved in the Chicken Claim were later employed by Astra, which is the company that became responsible for handling matters arising from the shipment of the frozen chicken backs.[1]  (Stipulated Facts at ¶ 2).

9.     The chicken was originally shipped via CMA Lines from the United States to Russia in early 2002.  (Stipulated Facts at ¶ 3; Trial Transcript of Michael Plotkin ("Plotkin Tr.")[2] at 84: 20 - 22).

10.     While the frozen chicken backs were en route to Russia, the Russian authorities imposed a ban on such products, so the shipment was delivered to the port of transloading in Hamburg, Germany.  (Stipulated Facts at ¶ 4; Plotkin Tr. at 84: 18 – 25, 85: 1).

---

[1] Given the confusion over the precise time that Astra took over for Cousins, "Cousins" should be read to mean "Cousins and/or Astra" unless otherwise indicated.
[2] All trial transcript citations will follow this format:  "[Witness' Last Name] Tr. at [Page]: [Line]"

11.    During the relevant time, Blue Water International A/S ("International"), a company with an office located at Tvaerkaj 2, Trafikhavnen 6701 Esbjerg, Denmark, was affiliated with Blue Water and shared the same parent company. (Declaration of Victor Sapp ("Sapp Decl.")[3] at ¶ 8).

12.    International and Victor Sapp assisted Cousins in the arrangements for storing the frozen chicken backs.  The cargo was ultimately stored in a bonded refrigerated warehouse in Tallinn, Estonia, under the supervision of Corvus Grupp Transport OU ("Corvus").  (Plotkin Tr. at 86: 4 − 8, 19 − 25, 87: 1 − 3).

13.    Mr. Sapp became Vice President of Blue Water on June 1, 2002. As the President, Mr. Kurt Skov, operated out of Blue Water's affiliated office in Denmark, Mr. Sapp was the senior person in Blue Water's U.S. office.  (Sapp Tr. at 179: 19 − 25, 180: 1 − 7).

14.    On August 8, 2002, Corvus sent an email to Cousins expressing some urgency about the need to dispose of the cargo.  (Exh. 112).  This email was part of a longer string of emails on which Cousins had not been copied, but which referenced the possibility of sending the chicken cargo back to origin, i.e., the United States.  (Exh. 112).  After Cousins' Mr. Plotkin read the email suggesting that the cargo be sent to the United States, he called Mr. Sapp and explained that such a suggestion was "complete nonsense".  (Plotkin Tr. at 103: 13 − 25, 104: 1 − 6).

15.    Mr. Sapp, as a person experienced in both the freight forwarding and non-vessel operating common carrier ("NVOCC") businesses, had independent knowledge of the restriction on importing frozen poultry to the United States.  (Sapp Tr.

---

[3] All citations to Declarations in Lieu of Direct Testimony will follow this format:  "[Last Name] Decl. at ¶ ___."

at 168: 20 – 25, 169: 1, 181: 25, 182: 1 – 6).  Indeed, Mr. Sapp stated that "[t]here is no

trade of frozen poultry from foreign countries into the U.S."  (Sapp Tr. at 184: 5 – 8); he

expressly agreed with Mr. Plotkin that it would be "complete nonsense" to try to import

such cargo (Sapp Tr. at 184: 15 – 25) and he knew there would be "troubles" when the

goods arrived in the United States.  (Sapp Tr. at 244: 13 – 15).

16.    Blue Water never received any instructions or authorization from

Cousins to ship the frozen chicken backs to the U.S. (Sapp Tr. at 207: 24 – 25, 236: 8 –

12).

17.    Despite the foregoing, Blue Water nevertheless assisted with the

arrangements to ship the frozen chicken backs to the United States in early November.

(Exhs. 8, 9; Sapp Tr. at 243: 25, 244: 1 – 5).  Blue Water's participation in the shipment

of the cargo back to the United States included (1) assisting in drafting the bill of lading,

including specific instructions to Corvus as to who should be listed as the Notify Party

(Sapp Tr. at  222: 6 – 10; Deposition Transcript of Victor Sapp, ("Sapp Dep.") [4] at 50: 19

– 25, 51: 2 – 10; Exh. 11) and (2)  engaging in extensive email communications with

Corvus concerning the arrangements for the shipment. (Exhs. 8, 9).

18.    With respect to Blue Water's involvement with the shipment

arrangements, Blue Water deliberately avoided listing any party other than Cousins on

the documentation.  Indeed, the reason Blue Water requested that Cousins, as opposed to

Blue Water, be listed as the Notify Party was because "we didn't want to be mentioned on

any document."  (Sapp Tr. at 207: 23 – 25, 208: 1).  Further, prior to the shipment, when

Corvus expressed concern about potential liability when the cargo would arrive and no

one would claim it (presumably because all parties knew that Cousins never knew about

---

[4] All citations to testimony from depositions will follow this format:  "[Last Name] Dep. at [Page]:  [Line]."

the shipment or never intended to claim the cargo upon arrival), Mr. Sapp immediately advised Corvus how the shipment arrangements would work, i.e., that the parties not mentioned on the bill of lading would be able to avoid liability. (Exh. 9 BWS 00449; Sapp Tr. at 204: 3 – 7, 207: 23 – 25, 208: 1).

19.    In addition, Blue Water's affiliated office, International, received the freight invoice for the shipment of the chicken backs. (Exh. 10). Blue Water never sent a copy of the freight invoice to Cousins (Plotkin Dep. at 76: 5 – 14, Tstishvili Dep. at 18: 18 – 25) and when Blue Water asked Cousins to pay the freight, Cousins refused to do so, which is logical because freight is a cost paid by the shipper of cargo. (Sapp Tr. 231: 9 – 25, 282: 1 – 25, 233: 1 – 4, Tstishvili Dep. at 18: 22 – 25, 19: 2 – 17, 20: 20 – 25, 21: 2 – 9).

20.    Throughout the entire process of making the arrangements to ship the cargo to the U.S., Mr. Sapp never consulted Cousins' about the shipment. (Sapp Tr. at 208: 25, 209: 1 – 7, 211: 2 – 9, 248: 6 – 14, 248: 23 – 25). Instead, Mr. Sapp rationalized his participation in arranging the shipment on an unconfirmed, unsupported and dubious assumption that a separate line of communication existed between Cousins and Corvus about the shipment. (Sapp Tr. at 207: 10 – 15, 208: 8 – 24, 211: 2 – 12). Indeed, Cousins and Corvus were not even directly communicating around this time, as Cousins saw Corvus' role as merely a place to store the chicken, while Cousins' itself made the efforts to sell the cargo elsewhere on its own. (Plotkin Tr. 87: 16 – 24). Further, both Messrs. Plotkin and Tsitlishvili clearly testified that they never instructed Corvus – or anyone – to ship the cargo to the U.S. (Plotkin Tr. at 88: 20 – 25, 89: 1 – 10; Tsitlishvili Tr. at 108: 25, 109: 1 – 16; Anderson-Ross Tr. at 20: 2 – 5).

21.     Notably, on all the emails about the shipment arrangements involving Blue Water, Cousins' participation is strikingly absent. Blue Water claims that other emails may have existed wherein Cousins was copied (Sapp Tr. at 206: 24 – 25, 207: 1 – 3, 210: 19 - 23), but Blue Water was unable to produce a single supporting email. Blue Water's counsel represented that the reason for this failure to produce the documents is because Blue Water's main server went down. (Tr. 215:  1 – 9).  However, there was no back up system, nor was Blue Water able to locate even a single hard copy or printed email, either from its Danish or U.S. office, to support its assertion. (Sapp Tr. at 215: 1 – 20).

22.     The closest example of any attempt to include Cousins  - or at least to notify Cousins – of the arrangements for the shipment was an email sent from Blue Water to Corvus (i.e., not actually directly to Cousins) *after the cargo was en route to the United States*, which provided that the original bills of lading should not be sent to Blue Water, but instead should be forwarded to Astra (i.e., Cousins).  (Exh. 9 BWS 00451)  There is no evidence, however, that the bill of lading was ever so sent and, in fact, Mr. Plotkin specifically testified that he only received the bill of lading at a later date from APL (as opposed to from Corvus or Blue Water). (Plotkin Tr. at 105: 6-14).

23.     When the chicken arrived in the U.S., APL notified Cousins of its arrival.   Natan Tsitlishvili, the then vice president of Cousins, and Michael Plotkin, the then director of logistics of Cousins, were both shocked to learn that the frozen chicken backs had arrived in the United States, as they had no prior knowledge of the carriage of the containers by APL. (Plotkin Dep. at 20: 7 – 18; Tsitlishvili Dep. at 14: 16 – 25, 15: 2 – 9).

8

24.    On January 30, Suzan Anderson-Ross of APL's Claims Department sent a letter to Messrs. Plotkin and Sapp to inform them that the cargo was under a USDA hold, that the containers were sitting in the terminal in Charleston accumulating demurrage and setting forth APL's understanding that Cousins had never authorized the shipment. (Exh. 17).

25.    Mr. Sapp never replied to Ms. Anderson-Ross' January 30 letter, but Mr. Plotkin responded the following day and attached a fully executed  "Letter of Abandonment" disavowing ownership of the chicken. (Exh. 18).

26.    Once APL received the Letter of Abandonment, APL commenced the process of arranging for the destruction of the cargo.  (Stephens Decl. at ¶ ¶ 8 - 9).  The USDA then issued an Emergency Action Notification ("EAN") authorizing destruction and APL then made all arrangements for the destruction of the cargo. (Stephens Decl. at ¶ ¶ 8 - 9, Exh. 20).

27.    While APL was making the arrangements to destroy the chicken, APL sent follow-up letters to Blue Water and Cousins. (Exhs. 25, 27).  In response to these communications, Blue Water's Mr. Sapp claimed complete ignorance of the shipments, despite his direct and personal involvement with the arrangements for the shipment. (Exh. 26; Sapp Tr. at 239: 3 – 16, 240: 19 – 25, 241: 1 – 6).  After APL obtained copies of the various email communications between Blue Water and Corvus about the shipment arrangements and forwarded copies of the material  to Blue Water, Blue Water immediately forwarded the documents to International, admitting, "[d]o not know how they got all the emails..." (Exhs. 28, 111).

28.     APL paid all expenses associated with the destruction, which totaled $10,758.13.  This amount was comprised of the following:  (1) $4,800 for trucking expenses to the Oakridge Landfill where the chicken was destroyed by deep burial; $600.00 for the Wrecker Service necessary for digging the hole and burying the chicken; and $5,358.13 to the Oakridge Landfill for the actual burial.  (Pl. Exhs. 33, 34, 35; Anderson-Ross Decl. at ¶ 21(c)).

29.     The applicable tariff rate for demurrage for the four containers holding the frozen chicken backs amounted $133.00 each for the first four days and $159.00 each for every day thereafter.  The total demurrage accumulated, therefore, was $54,280.00.  (Exh. 32; Anderson-Ross Decl. at ¶ 21(b)).

## CHICKEN CLAIM

### Conclusions of Law

30.     In its Amended Complaint, APL brought two actions against Blue Water related to the Chicken Claim:  first, a breach of contract claim; and second, a claim sounding in fraud.

### Breach of Contract

31.     APL's bill of lading terms and conditions governed the shipment of the frozen chicken backs to the United States.

32.     Under APL's bill of lading terms and conditions, a "Merchant" is defined as a "Shipper" or an agent thereof.

33.   An undisclosed principal can incur liability as a Shipper when it manipulates the system to avoid liability. *Solar Int'l Shipping Agency, Inc. v. Eastern Proteins Export, Inc.*, 778 F.2d 922, 925 (2d Cir. 1985).

34.   Blue Water's failure to produce any emails – or any print out of any email or other communication – evidencing Blue Water's attempts to inform Cousins of the shipment raises an inference that such evidence would be unfavorable to Blue Water. *The Tupman Thurlow Co., Inc. v. S.S. Cap Castillo,* 490 F.2d 302, 308 (2d Cir. 1974) ("The non-production of material evidence which is in the control of a party raises an inference that that evidence is unfavorable to that party.")  Under the circumstances of this case, it is reasonable to draw that inference here.

35.   Blue Water qualifies as a Shipper (and therefore a Merchant) under APL's bill of lading terms and conditions because it was clearly manipulating the situation to avoid liability.  In other words, by its actions, Blue Water assumed for itself the role of a "shipper" in this transaction.  Specifically, though Blue Water participated fully in the arrangements for the shipment (as evidenced by its assistance in preparing the bill of lading and the email communications), it deliberately avoided including its name on any shipping document in order to avoid liability and conceal its role in this transaction.   Indeed, (1) Mr. Sapp specifically  testified that he did not want Blue Water's name listed on any documentation, (2) Blue Water refused to accept the original bill of lading from Corvus (and asked that it be forwarded elsewhere), and (3) when Corvus asked about potential liability, Mr. Sapp specifically explained to Corvus that it could not be found liable because it was not listed on any document.  Thus, Blue Water's intention was clear:  by shipping the goods without disclosing its name on the

documentation, Blue Water thought it could avoid being found liable for resulting damages. In that regard, Blue Water certainly knew in advance that the goods could not be imported. Further, as someone experienced in the NVOCC and freight forwarding business, Mr. Sapp knew that the poultry would create problems for APL upon arrival, all the more motivation for him to avoid listing Blue Water on the documentation.

36.    Further, Blue Water alleges that it did not instruct or authorize Corvus to book or arrange for the shipment. (Blue Water's Proposed Findings of Fact ¶ 23). Given the foregoing, however, such a statement is factually inaccurate. Indeed, the entire purpose of the email communications was to provide instructions and arrangements as among Blue Water, International and Corvus concerning the shipment. As mentioned above, Blue Water provided specific instructions to arrange for the shipment, including specifically instructing Corvus as to the party that should be listed on the bill of lading and specifically instructing Corvus where the shipping documents should be sent. Further, upon hearing of Corvus' doubts that their plan would work, Mr. Sapp confidently assured Corvus that it would not be the party found liable if the plan unfolded as expected. This type of declaration is nothing short of an authorization to Corvus to proceed as intended, as no harm would befall it.

37.    Based on the foregoing, this Court finds that Blue Water cannot avoid liability by such manipulation and, therefore, qualifies as the Shipper (and therefore a "Merchant") under APL's bill of lading terms and conditions. As Blue Water availed itself of the benefits of being the cargo owner by arranging for the shipment, it should also be subject to any liabilities that arise therefrom.

38.   This Court further finds that if International was the true shipper, for the same reasons listed above, as well as the fact that International received and paid for the freight invoice for the shipment, Blue Water would nevertheless qualify as a "Merchant" in accordance with APL's bill of lading because Blue Water's actions were on International's behalf and subject to its control, as evidenced by the communication discussed here.  Restatement (Third) of Agency, § 1.01 ("[a]gency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.")  Certainly the evidence establishes that International reimbursed Corvus for the freight charges for the containers.  This fact, coupled with Mr. Sapp's active participation all indicates that Blue Water was directly involved, whether as a "shipper" in its own right or as the agent of the *de facto* shipper, International.

39.   A bill of lading is a contract and, like any contract, when the language of the contract is unambiguous, it must be interpreted according to the plain language. *International Knitwear Co. Ltd. v. M/V Zim Canada,* No. 92 Civ. 7508, 1994 U.S. Dist. LEXIS 14180, at *8 (S.D.N.Y. October 6, 1994).

40.   As a Merchant, Blue Water warranted in accordance with Clause 3 of APL's bill of lading terms and conditions, that "it is, or has the authority of the Person owning or entitled to the possession of the Goods."

41.   This Court finds that Blue Water is in breach of Clause 3 of APL's bill of lading because it did not have Cousins' authority to ship the cargo.  Crucial to this Court's analysis is Blue Water's unambiguous testimony that Cousins never authorized it

13

to ship the cargo. Further, Blue Water's argument that Mr. Sapp assumed that a second

line of communication existed between Cousins and Corvus is unavailing because (1) a

negative inference must be applied to Blue Water's inability to produce a single document

supporting its position; and (2) even without a negative inference, Blue Water's

assumption has no underlying support. Indeed, Mr. Sapp's assumption is particularly

dubious in light of the facts that Cousins had specifically told Mr. Sapp that it would be

"complete nonsense" to ship the cargo to the U.S., Blue Water independently agreed with

this analysis, Blue Water was aware that there would be "troubles" when the cargo

arrived and Blue Water understood that the cargo would arrive and no one would be there

to claim it. As Blue Water did not have the authority of Cousins – nor was it reasonable

for Blue Water to assume that Cousins had authorized the shipment – Blue Water as the

*de facto* shipper or the agent of the *de facto* shipper is in breach of Clause 3 of APL's bill

of lading and, therefore, is liable to APL for the damages arising therefrom.

      42.   As a result of this breach, Blue Water is liable to APL in the

amount of $65,038.13 plus interest, comprised of the demurrage costs for storing the

cargo in its refrigerated containers ($54,280.00) and the destruction costs for disposing of

the merchandise in accordance with USDA and U.S. Customs authorization ($10,758.13).

**Fraud**

      43.   Under New Jersey law (given Blue Water's location in that state, it

is the appropriate law to apply), a claim for fraudulent inducement requires (1) that a

defendant make a knowing representation of a material fact; (2) with the intention to

induce the plaintiff to rely on the misrepresentation; (3) that the plaintiff actually relies

on the misrepresentation; and (4) that the plaintiff incur actual damages as a result of its reliance. *Gutman v. Howard Savings Bank,* 748 F. Supp. 254, 257 (D.N.J. 1990).

44.    To establish this cause of action, APL was required to prove the elements by clear and convincing evidence. While Mr. Sapp's conduct was highly questionable and improper, the Court finds that APL has not met this difficult burden. As such, judgment will be entered for Blue Water on this claim.

## GARLIC CLAIM

### Findings of Fact

45.    In March and April 2003, 29 containers of fresh garlic were shipped aboard four different vessels, the M/V Mokihana, the M/V President Wilson, the M/V Mokihana, and the M/V Manoa, from China to the United States. (Stipulated Facts at ¶ ¶ 31 – 35).

46.    APL was the ocean carrier for the shipments of garlic and the goods were shipped pursuant to APL's bills of lading. (Stipulated Facts at ¶ ¶ 31 – 35; Exh. 37).

47.    Blue Water was the NVOCC with respect to the shipments of 29 containers of garlic. (Sapp Dep. at 153: 20-23; Day Tr. at 338: 7-13).

48.    Akata Food Trading, Inc. ("Akata") was the ultimate consignee of the goods and was Blue Water's customer. (Sapp Dep. at 40: 3 – 10; Xu Dep. at 89: 2 – 6; Exh. 37).

49.    Both House Bills of Lading and Master Bills of Lading were generated for each shipment of garlic. On every House Bill of Lading (issued by Blue Water), Huaiyang Hongda Dehydrated Vegetable Company ("Huaiyang") was listed as

the Shipper and Akata was listed as the Consignee and Notify Party. (Stipulated Facts ¶¶ 38, 39).

50.     On every Master Bill of Lading (issued by APL), with one exception, OEC Logistics (Qingdao) Co. ("OEC") was listed as the Shipper, and Blue Water was listed as the Consignee and Notify Party. With respect to bill of lading APLU 025753738, the Shipper is listed as "Huaiyang Hongda Dehydrated Vegetable Company, on behalf of OEC Logistics (Qingdao) Co., Ltd." The Consignee and Notify Party for APLU 025753738 are both listed as "Akata Food Trading Inc. on behalf of Blue Water Shipping U.S., Inc." (Stipulated Facts ¶ 40).

51.     The shipments of garlic arrived in California on the following dates: the containers on the M/V MOKIHANA arrived on March 31, 2003; the containers on the M/V PRESIDENT WILSON arrived on April 1, 2003; the containers on the M/V MOKIHANA arrived on April 16, 2003 and the containers on the M/V MANOA arrived on April 22, 2003. (Stipulated Facts. ¶¶ 32 – 35). APL notified Blue Water of the arrival of the shipments and provided courtesy shipment status updates concerning the cargo. (Exhs. 39, 46).

52.     If a customer does not pick up the containers within a fixed amount of time, demurrage starts to accrue. (Powers Tr. at 77: 16 – 19). Demurrage is intended to cover the fixed costs incurred by the terminal (APL) for upkeep of the containers, including monitoring, maintenance and electricity costs. (Powers Tr. at 78: 1 – 3). Demurrage does not include any lost revenue incurred by APL for not having the containers available for further commercial use. (Powers Tr. at 78: 5 – 9). Given that situation, it is obvious that APL is better off if its containers are promptly picked up so

that the containers (especially refrigerated containers as here) can be returned to revenue-generating activities.

53.     When the shipments of garlic arrived in the United States, they were assessed by U.S. Customs at 376.76% Anti-Dumping Duties.  (Stipulated Facts ¶ 45).  While the consignee would need to pay this duty when it claims its cargo, a subsequent purchaser is unaffected by this duty if the goods are sold by U.S. Customs at a quick sale.  (Day Tr. 356: 4 – 25, 357: 1 – 11).

54.     The USDA and the FDA placed a number of holds on the shipments as well.  While most of the holds were removed within a matter of days, two holds remained on the containers under bill of lading numbers APLU 025753771 and APL 025753775 until June 3, 2003.  (Exhs. 85 APL 00742, Exh. 89 APL 00766).

55.     When the cargo did not clear Customs within 15 days, Mark Porter, APL's Customs Compliance Clerk, sent the required general order ("G.O.") Notifications to U.S. Customs and Crescent Warehouse Company, Ltd. ("Crescent"), a local customs G.O. bonded storage facility, though a few notifications were sent late. (Exh. 44; Porter Decl. at ¶ 10).  With these G.O. Notifications, Mr. Porter attached a letter requesting the assignment of a constructive G.O. number.  Mr. Porter included this request because, as he explained in the letter, the commodity was fresh garlic and, since the G.O. Warehouse did not have freezer capacity, nor was there any bonded cold storage facility in the Los Angeles area, the garlic had to remain in APL's refrigerated or "reefer" containers.  (Exh. 44, e.g., APL 00085; Porter Decl. ¶ 10; Ewers Dep. at 15: 16 – 18, 17: 8 – 15).  In addition, Mr. Porter called U.S. Customs at this time to advise that he was sending over the requests for the assignment of constructive G.O. (Porter Decl. at ¶ 14).

56.     As requested by Mr. Porter in his G.O. Notifications to Crescent and U.S. Customs, the cargo was thus placed in "constructive G.O." and remained in APL's reefer containers pending the disposition of the cargo at Customs' direction. (Expert Report of John Day ("Day Report") p. 5). Once goods have been placed in G.O. status, whether at a G.O. warehouse or constructively with a carrier, those goods are under Customs' control. (Day Report p. 2-3).

57.     At this time, APL could not have known that Akata (Blue Water's customer) was not going to pick up the garlic, especially since Blue Water was assuring APL at the same time that its customer intended to take delivery of the cargo. In fact, APL received specific assurances from Blue Water on April 21, stating:

> We are aware of that above shipment are now on demurrage [*sic.*] since 4/8/03; up to now us customs still not cleared yet.
>
> We are informed by our customer [*Akata*] and their broker, east west ass. that they are trying to clear it asap now. *And it is expected to be done early this week.* (Exh. 49) (emphasis added).

Indeed, not only was APL receiving assurances at this time, but Blue Water was providing estimations of when the cargo would be cleared and claimed. (Exh. 49). Indeed, Blue Water's expert could provide no factual basis to support an assertion that APL should have known at this time that Akata would not claim the cargo. (Brauner Tr. at 380: 8 – 20).

58.     Despite Blue Water's assurances, APL continued to pressure Blue Water during the end of April and into May about the containers. Indeed, APL contacted Blue Water by phone, email and fax to express how urgent it was for  Blue Water's customer to pick up the containers. (Exhs. 46, 48, 50 APL 00312 – 14, 55 BWS 00501 – 2; Porter Decl. at ¶ ¶ 9, 12; Powers Decl. at ¶ 13). In response to APL's urgent

requests, Blue Water continued to assure APL through the end of May that its customer,

Akata, was aware of the accruing demurrage and had every intention to pick up the cargo

once certain issues were resolved.  (Exhs. 49, 55, 91 APL 00778).  The last known

assurance from Blue Water was May 23, 2003. (Exh. 91 APL 00778).

        59.      Though APL was receiving assurances from Blue Water that

Akata intended to take delivery of the garlic, APL nevertheless commenced the process

of trying to expedite the disposition of the garlic in mid-May.  (Porter Decl. at ¶ 13).

APL could not, however, unilaterally dispose of the garlic without the authorization of

U.S. Customs. (Day Report p. 6; Porter Tr. at 135: 10 – 14).  On May 19, Mark Porter

contacted Inspector Rachel S. Ybarra of U.S. Customs to see how APL could work

within the customs regulations to dispose of the cargo. (Exh. 50 APL 00300, Porter Tr. at

135: 2 – 9).  Inspector Ybarra, however, (it turns out mistakenly) stated that the cargo

would have to remain on the pier for six months.  (Exh. 50 APL 00300; Porter Tr. at 134:

5 – 25, 135: 1 - 5).

        60.      Though APL's "primary responsibility was to be a hundred

percent in compliance with U.S. Customs," APL wanted to get its containers back "as

soon as possible." (Porter Tr. at 135: 2 - 5).  Thus, when Mr. Porter spoke with Inspector

Ybarra two days later on May 21, he again tried to express the urgency of the matter by

referring to the refrigerated containers and explaining how much demurrage would

accrue if APL maintained the cargo in its containers for six months.  Inspector Ybarra,

again reiterated the six months rule during this conversation. (Exh. 59 APL 00369,

Porter Decl. at ¶ 13 – 14).

61.     When this second call with U.S. Customs failed to generate helpful results, Mr. Porter contacted (that same day) Kris Stephens of APL's Customs Compliance Group for assistance.  (Porter Decl. at ¶ 13 - 14; Exh. 59 00369)  The next day, May 22, Ms. Stephens contacted Inspector Ybarra's supervisor.  The supervisor, however, was unavailable, so Ms. Stephens left a message concerning the containers.  As Ms. Stephens was leaving for vacation shortly thereafter, she left the name and number of her colleague, Kelly Reynolds, so the communications with U.S. Customs could continue without delay.  (Stephens Tr. at 152: 19 – 25, 153: 1 – 17; Exhs. 50 APL 00295, 59 APL 00378).

62.     In response to Ms. Stephens call, the supervisor inspector called Ms. Reynolds the following day (May 23).  In the message, the supervisor inspector left the FDA's telephone number for APL to contact. (Exh. 50 APL 00287 - 00288).

63.     Ms. Reynolds advised Ms. Stephens that she not only called the supervisor back that same day but she also attempted to call the FDA agent 3 or 4 times. (Stephens Tr. at 164: 1 – 24;  Exh. 50 APL 00287-288)

64.     Around this time, Suzan Anderson-Ross of APL engaged a surveyor to assess the condition of the garlic and a survey was conducted on May 23. APL's purpose in arranging for this survey was, assuming the garlic was still saleable, APL could use the survey "to convince U.S. Customs to act quickly, as fresh garlic is a perishable commodity."  (Anderson-Ross Decl. at ¶ 29; Exh. 58).

65.     While Mr. Porter, Ms. Stephens and Ms. Reynolds were attempting to get action from U.S. Customs, and Ms. Anderson-Ross was arranging for the survey of the garlic, Liam Powers of APL and Mr. Porter continued contacting Victor

Sapp to seek assistance from Blue Water. (Exh. 64; Porter Decl. at ¶ 15; Powers Decl. at ¶ ¶ 13, 15). Blue Water, however, never followed up with any actual assistance. Indeed, Blue Water never even provided a legitimate letter of abandonment despite the requests of Mr. Powers, Mr. Porter and Ms. Anderson-Ross. (Exhs. 64 BWS 00500, 66 BWS 00048; Porter Tr. at 130: 20 – 25, 131: 1 – 5; Powers Tr. at 79: 21 – 25, 80: 1 - 3).

66.     In early June, Mr. Porter continued his attempts to persuade Inspector Ybarra that the cargo could be disposed of more quickly.   During a call on June 5, Inspector Ybarra finally advised APL that a quick sale procedure could be used to dispose of the merchandise. (Exh. 51 APL 00829)

67.     As the disposition process was now in motion, Mr. Porter and Inspector Ybarra spoke again a few days later, on June 11. (Exh. 108, Exh. 72 APL 00898). During this call, Inspector Ybarra informed Mr. Porter that the FDA needed to inspect the cargo and would then make the determination as to whether the cargo could be sold or whether it had to be destroyed. (Exh. 72 APL 00898).   Indeed, even if APL would have preferred to immediately destroy the cargo at this time, it could not have done so until the examination of the cargo and the recommendation for destruction by EG&G. (Ybarra Dep. at 78: 13 – 15). EG&G is a company under contract with Customs:  this company is involved in all disposition of goods under Customs' jurisdiction and control. (Day Report p. 2-3).

68.     Inspector Ybarra further advised Mr. Porter on June 11 that, in the event the FDA determined the cargo could be sold, Mr. Porter had to contact Cindy Ewers of Crescent to arrange for a quick sale. (Ybarra Dep. at 71: 2 – 8). To avoid further delays, Mr. Porter forwarded a fax to Ms. Ewers that same day (June 11) and

requested that Ms. Ewers complete the Customs Forms ("CFs") 5251 (Orders to Transfer Merchandise for Public Auction (Sale)) "as soon as possible" given "the perishable nature of the cargo." (Exh. 70 APL 00865, Porter Tr. at 143: 5 – 18, Porter Decl. at ¶ 16).

69.     When Cindy Ewers of Crescent received the June 11th letter, she understood the urgency of the matter because she knew that "APL wanted their equipment back." (Ewers Dep. at 36: 16 – 23). Yet Ms. Ewers did not believe she had to fill out the forms for constructive G.O. cargo. (Ewers Dep. at 18: 16 – 21). Thus, there was a delay in the process as Ms. Ewers consulted with U.S. Customs and APL as to whether she had to fill out the forms. (Ewers Dep. at 34: 7 – 18, 38: 11 – 14). Once Mr. Ewers reluctantly agreed that U.S. Customs would only accept the CFs 5251 from the G.O. Warehouse, she prepared the forms and sent them to U.S. Customs on June 23, approximately two weeks after Mr. Porter's specific request. (Ewers Dep. at 18: 16 – 25, 19: 1 – 5; Ybarra Dep. at 71: 3-11; Exhs. 71, 75, 76).

70.     During this time, Inspector Ybarra was working with the FDA to make sure that the cargo could be sold or, alternatively, whether it would have to be destroyed per recommendation of the FDA. (Ybarra Dep. at 70: 13 – 21, 71: 12 – 23).

71.     APL was also contacting the FDA around this time to apply extra pressure so the matter could be resolved promptly. (Stephens Tr. at 160: 6 – 20, Exh. 72 APL 00897). Specifically, Ms. Stephens contacted Tim Perry, APL's regulatory manager in Washington DC, requesting that he follow up with the FDA so the disposition process could be resolved as promptly as possible. (Stephens Tr. at 159: 14 – 25, 160: 1 – 20; Exh. 72 APL 00897). In another attempt to expedite the disposition of the cargo, APL initiated contact with the Customs Management Center (CMC), which is the supervisory

office that oversees the port directors and reports directly to the Commissioner of U.S. Customs in Washington, DC. (Day Report p. 6- 7; Stephens Decl. at ¶ 14; Exh. 72 APL 00897 – 898).

> 72.    The cargo was not inspected for sale until July 16, 2003 because that was the date the FDA inspector was available. (Ybarra Dep. at 75: 16 – 24). On the following day, the FDA issued its determination that the cargo was not saleable and EG&G recommended that it be destroyed on July 24, 2003. (Exhs. 74, 77; Ybarra Dep. at 71: 15 – 19, 99: 21 – 25, 100: 1 – 7; Stephens Decl. at ¶ 15). As explained by Inspector Ybarra, the cargo could not be destroyed before this recommendation from EG&G. (Ybarra Dep. at 78: 13 – 15).

> 73.    Inspector Ybarra thereafter instructed Ms. Ewers to prepare the necessary CFs 3499 (Application and Approval to Manipulate, Examine, Sample or Transfer Goods) so the garlic could be destroyed in accordance with EG&G's recommendation. (Ewers Dep. at 51: 22 – 23). Again, however, there was a dispute between Crescent's Ms. Ewers and Inspector Ybarra as to whether Ms. Ewers (as opposed to APL) had to prepare the forms. Inspector Ybarra again insisted that only Ms. Ewers could prepare the CFs 3499. (Ewers Dep. at 52: 24 – 25). The matter was further delayed because Inspector Ybarra rejected the CFs 3499 numerous times because Ms. Ewers had filled the forms out improperly. It took Ms. Ewers three attempts to prepare the forms before U.S. Customs would accept them, which it did on August 11, 2003. (Exh. 78; Ybarra Dep. at 82: 13 – 18, 83: 2 – 25, 84: 1 – 2, 10 – 13).

74.     The garlic was destroyed, at the expense of APL, between August 13 and August 25, 2003.  Specifically, the garlic in the following containers was destroyed on the following days:

> TRLU1844615, destroyed August 13, 2003,
> APLU6930396, destroyed August 13, 2003,
> APLU6935546, destroyed August 13, 2003,
> CRLU9102771, destroyed August 14, 2003,
> APLU6935931, destroyed August 14, 2003,
> APLU6944975, destroyed August 14, 2003
> TRLU1922390, destroyed August 15, 2003,
> APRU5020834, destroyed August 15, 2003
> APLU5993960, destroyed August 15, 2003,
> GCEU7742013, destroyed August 18, 2003,
> CRLU5110378, destroyed August 18, 2003,
> TRLU1949405, destroyed August 18, 2003,
> APRU5028012, destroyed August 19, 2003
> CRLU5109361, destroyed August 19, 2003,
> APLU6934452, destroyed August 19, 2003
> APRU5031525, destroyed August 20, 2003,
> APLU6915452, destroyed August 20, 2003,
> APRU5042751, destroyed August 20, 2003,
> APLU6948224, destroyed August 21, 2003,
> TRLU1946622, destroyed August 21, 2003,
> TRLU1949257, destroyed August 21, 2003,
> APLU6932090, destroyed August 22, 2003,
> APLU5986050, destroyed August 22, 2003,
> APLU6945267, destroyed August 22, 2003,
> APLU6912495, destroyed August 25, 2003,
> APLU6947444, destroyed August 25, 2003,
> (Stipulated Facts at ¶ 62).

75.     The garlic in containers APLU599345, APLU6914332, and CRLU513008 was sold on August 22, 2003 in Miami, Florida.  (Exh. 91 APL 00778).

76.     The Applicable Tariff rate for the shipment of fresh garlic was $100.00 for the first four days and $120.00 for each day thereafter.  (Exh. 102, Anderson-Ross Decl. at ¶ 31(c)).

77.     APL's total damages for the garlic claim amount to $474,072.18 in expenses, comprised of $402,700.00 in demurrage for the 29 containers, $2,600 for the L.A. Marine survey of the cargo in May 2003, $425.00 for Marine Surveyors of the cargo prior to its destruction, $62,192.18 for the destruction costs, and $6,155.00 for outstanding miscellaneous items, including $80.00 for documentation handling, $1,500.00 for expenses relating to diversion costs, $2,075.00 for charges incurred from the USDA Tailgate / 2% Tailgate Inspection Fees and $2,500.00 in outstanding shipping and handling costs.  (Pl. Exhs. 58, 97, 98, 99, 100, 101, and 102; Anderson-Ross Decl. at ¶ 31).

**General Order and the Quick Sale Procedure**

78.     Once unclaimed cargo has not cleared customs within 15 days, the cargo is eligible for G.O.  (Day Report p. 2).  Once in G.O., the cargo is under the custody and control of U.S. Customs.  (Brauner Tr. 369: 7 – 8, Day Report p. 7).  If the G.O. merchandise is perishable, the customs regulations provide that it can be auctioned by a quick sale. (Day Report p. 2 -3).

79.     A quick sale is a process by which special merchandise can be sold under the authority of U.S. Customs at an accelerated rate given its perishable nature.  (Day Report p. 2).  As explained by APL's expert on U.S. Customs:

> A quick sale is accomplished by the G.O. Warehouse notifying U.S. Customs and the sale contractor, EG&G, that special merchandise has been received in the G.O. Warehouse. EG&G conducts an appraisal of the merchandise which, depending on the nature of the goods, may include participation by U.S. Customs or other governmental agencies. For example, USDA or FDA generally are involved when the merchandise is comprised of perishable food. Once EG&G has made its appraisal and advised whether the merchandise is "saleable", the

U.S. Customs port director must either approve the sale of merchandise or order the destruction of unsaleable goods before the merchandise can be disposed.

If the goods are considered saleable, the G.O. Warehouse prepares the CF 5251, which notifies involved parties that the goods are scheduled for sale or destruction on a specific date.  A three day public notice of sale of perishable merchandise is then made and the sale is conducted by EG&G, the same company that appraised the goods.

(Day Report p. 2 –3)  (citations omitted).

80.    A carrier cannot unilaterally arrange for a quick sale without the cooperation and authorization of U.S. Customs and the other relevant governmental entities.  (Porter Tr. at  135:  10 – 14).  Indeed, it is not the carrier that is to request the quick sale initially, but the G.O. Warehouse.  (Day Report p. 2;  Brauner Tr. 366: 17 – 22).  Ybarra Dep. at 64: 22 – 25, 65: 1 – 8).  Further, unlike the assertion in paragraph 49 of Blue Water's Proposed Findings of Fact, there is no requirement for a carrier to make an application for a quick sale.   Blue Water cites John Day's testimony and states that a quick sale process requires "making an application to Customs for a quick sale."  (Blue Water's Proposed Findings of Fact ¶ 49).  This assertion is a mischaracterization of the testimony, as Mr. Day specifically testified on numerous occasions that a party does not prepare an application to commence a quick sale. (Day Tr. 306:  14 – 16, 320: 14 – 16, 321: 2 – 3).   Further, if Blue Water's use of the word 'application' is alluding to the CFs 5251, Blue Water omitted the point, discussed below, that these forms are to be prepared by the G.O. Warehouse.

81.    A quick sale cannot take place until an appraisal is conducted by EG&G.  (Day Report p. 2 – 3, Ybarra Dep. at 65: 5 – 7).  Moreover, even after EG&G advises that merchandise is saleable, the G.O. Warehouse must then prepare the

necessary forms (the CFs 5251) and then the sale must then be approved by U.S. Customs.  (Day Report p. 3, Ybarra 65: 12 – 18, Day Tr. 336: 10 - 14).  The carrier does not conduct the sale, the sale must be conducted by EG&G.  (Day Report p. 3).

82.     The entire quick sale process typically takes  two to three weeks if the G.O. Warehouse and U.S. Customs are properly carrying out their respective responsibilities and the appropriate regulations.  (Day Tr. 335: 13 – 24).

83.     If merchandise is sold by quick sale, the purchaser does not need to pay any customs duties, such as anti-dumping duties, that have been imposed on the product.   (Day Tr. 356: 4 – 25, 357: 1 – 11).   Thus, Blue Water is inaccurate when it states the number of potential purchasers of the garlic would be limited on account of these duties (and for that reason, it is irrelevant whether APL knew of the duties or not, as the duties have no bearing on potential purchasers after the cargo has already been sent to G.O.)  (Blue Water Proposed Findings of Fact ¶ 58).   Notably, Blue Water's support for that paragraph relates only to APL's knowledge of the duties, as there is no support for an assertion that potential buyers would be limited once the cargo is in G.O. (Blue Water Proposed Findings of Fact ¶ 58).

84.     If merchandise under Customs' jurisdiction must be destroyed, the G.O. Warehouse needs to prepare a separate form, i.e., a CF 3499 (Application and Approval to Manipulate, Examine, Sample or Transfer Goods) (Day Report p. 3).  The Customs' port director will then need to approve the CF 3499 before the merchandise can be destroyed.  (Day Report p. 3, Day Tr. 336: 19 – 25).

## THE GARLIC CLAIM

### Conclusions of Law

**Liability**

85.     A NVOCC is defined, by statute, as "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier." 46 USCA App. § 1702(17)(B), *see also Ultimo Cabinet Corp. v. M/V Mason Lyes,* No. 90 Civ. 2748, 1991 U.S. Dist. LEXIS 581, at *4, 1991 AMC 1343, 1345 (S.D.N.Y. January 17, 1991).   An NVOCC is statutorily distinguishable from a freight forwarder because the latter is defined as only "dispatch[ing] shipments *from* the United States," as opposed to shipments that are destined for the United States.  46 USCA App. § 1702(17)(A)(i).  This Court finds that Blue Water was a NVOCC with respect to the shipments of garlic.

86.     Under APL's bill of lading terms and conditions, the definition of a "Merchant" includes a Shipper.  As an NVOCC, Blue Water is considered, by statute, a shipper in its relationship with APL.  Therefore, Blue Water qualifies as a Merchant under APL's bill of lading and is subject to and bound by APL's bill of lading terms and conditions.

87.     Typically House Bills of Lading are issued as the contractual agreement between the NVOCC and the cargo owner, while Master Bills of Lading represent the contractual agreement between the NVOCC and the carrier. *All Pacific Trading Inc. v. Hanjin Container Line, Inc.,* 7 F.3d 1427, 1430 (9th Cir. 1993).  Thus, the MBL was the contractual agreement governing the relationship between APL and Blue Water.

28

88.    On the MBLs, Blue Water is listed as the Consignee and Notify Party.  Further, under the APL's bill of lading terms and conditions, a Merchant is defined as, among other things a "consignee" or "receiver." Thus, Blue Water is a "Merchant" subject to and bound by APL's bill of lading terms and conditions.

89.    Clause 14(iii) of the APL bill of lading specifically states that all those defined as a "Merchant" shall be jointly and severally liable to the carrier for all charges due under the bill of lading together with freight.

90.    Under Clauses 21(iii), (iv), and (ix) of APL's bill of lading, the Merchant is required to take delivery of the goods, and any costs or expense resulting from a failure to do so are the responsibility of the Merchant.   Thus, Blue Water, as a Merchant, is liable to APL for the costs and expenses resulting from the Merchant's failure to take delivery of the goods.

**Damages**

91.    While Blue Water is liable to APL as a Merchant under APL's bill of lading terms and conditions, APL had a duty to mitigate its damages by taking the necessary steps to dispose of the garlic. *See, e.g., Dankrag Ltd. v. Intern. Terminal Operating Co.*, 729 F. Supp. 360, 365 (S.D.N.Y. 1990).

92.    Here, there is no dispute between APL and Blue Water that Blue Water owes APL for the disposal of the 29 containers and the miscellaneous expenses incurred by APL in the amount of $73,872.18.  (Blue Water's Proposed Conclusions of Law ¶ 36).  Thus, the only analysis for purposes of mitigation of damages relates to the $402,700.00 APL incurred in demurrage expenses.

93.     The burden of proving whether APL failed to mitigate its damages rests on Blue Water. *Fortis Corporate Ins. v. M/V CIELO DEL CANADA*, 320 F. Supp. 2d 95, 106 (S.D.N.Y. 2004) ("the burden lies on the party challenging the mitigation efforts undertaken to show that they were unreasonable") (citations omitted).

94.     Blue Water suggests that APL should only recover demurrage up until three weeks after each shipment was sent to G.O.  Blue Water bases this analysis on John Day's testimony that the quick sale process, which typically takes two to three weeks, should have been commenced by the G.O. Warehouse on the day the cargo was initially sent to G.O., i.e., April 18.  (Blue Water's Proposed Conclusions of Law ¶ 34). Blue Water's analysis is unavailing, however, for two main reasons:  (1)  it analyzes mitigation of damages under an incorrect legal standard;  and (2) it confuses a quick sale process with the process leading to destruction and, in doing so, inappropriately applies a 2 – 3 week standard.   Thus, Blue Water's analysis relating to the mitigation of damages must be rejected.

## *Legal Standard for Mitigation of Damages*

95.     Blue Water's analysis is misguided because it analyzes mitigation of damages under an incorrect legal standard.

96.     The duty to mitigate can apply in full force when a party exercises control over the damage that it is trying to avoid. *Vulcanite Roofing Co. v. Steamship Turret Crown,* 1927 AMC 1460, 1464 (S.D.N.Y. July 15, 1927) (holding that a shipowner could not be required to mitigate damages when it did not have possession or control over the goods); *In re Mirant Corp.,* 332 B.R. 139, 146 – 47 (Bankr. N.D.Tex.

2005) (finding that debtors could not be required to mitigate damages when they lacked control over the transportation capacity of pipeline energy).

97.     While APL may have had physical possession of the garlic, it did not have control over the disposition of the merchandise.   Indeed, there was no application APL could prepare, no document APL could fill out and no authorization APL could give in order to make this process move more quickly.   The only parties that truly could have expedited the disposition of the garlic were U.S. Customs and the G.O. Warehouse, as these were the parties that did have control over the cargo.   Thus, APL's only recourse, which it did exhaustively, was to apply pressure on  the appropriate authorities, such as U.S. Customs and the G.O. Warehouse, to encourage them to comply with their respective responsibilities and duties.

98.     In recognizing that APL's only option for mitigating damages was to encourage others to act, the test applied to APL's efforts is not whether it took every conceivable effort to force others to comply with their duties, or whether APL tried every avenue of communication with them that, with the benefit of hindsight, might seem more appropriate.   Indeed, "[t]he rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party."  *Id.* (citing *Sunpride (Cape) (Pty) Ltd. v. Mediterranean Shipping Co., S.A.,* No. 01 Civ. 3493 (CSH), 2003 U.S. Dist. LEXIS 20333, at *37 (S.D.N.Y. Nov. 12, 2003) (quoting *In re Kellet Aircraft Corp.,* 186 F.2d 197, 198-99 (3d Cir. 1950)).   Instead, the test for mitigation of damages is whether a party's actions were within the "range of reason."  As Judge Friendly explained:

> [I]f the plaintiff takes such action within the range of reason, the defendant is liable for further damages resulting

31

> therefrom. . . . It is not fatal to recovery that one course of action, reasonably open but not followed, would have avoided further injury whereas another, also reasonable and taken, produced it.

*Ellerman Lines, Ltd. v. President Harding,* 288 F.2d 288, 290 (2d Cir. 1961).   Thus, APL's efforts to encourage others to comply with their respective duties must be outside the "range of reason" in order for Blue Water to prevail on the argument that APL failed to mitigate its damages.

        99.    APL's actions were well within the "range of reason" under the circumstances with which it was presented.  Once the garlic was sent to G.O., its disposition was not under APL's control, but rather that of U.S. Customs.  Thus, the only recourse APL had at this time was to apply pressure on the appropriate authorities to promptly dispose of the merchandise.  As explained below, APL's efforts to do so were certainly within the range of range.

        100.    From the time the cargo was sent to G.O. until the end of May, APL was being constantly reassured by Blue Water that the named consignee (Akata) was aware of the accruing demurrage and was intending to pick up the cargo. Blue Water tries to underplay this point and argue that APL should have nevertheless known by April 18 that the consignee would claim the cargo.  (Blue Water's Proposed Conclusions of Law ¶ 29).  Blue Water, however, has no factual support for this assertion.  The reason for this lack of evidence is self-evident:  there is no way for a carrier to know at the time cargo is sent to G.O. whether the consignee will abandon cargo.  Indeed, this is particularly true when the only information the carrier is receiving is that the consignee will claim the cargo.  Blue Water cannot, on the one hand, provide such assurances during May 2003 and, when Blue Water's assurances prove to be wrong, now benefit

from an argument that APL should have disregarded Blue Water's own assurances that its customer would act appropriately.

101.    Even while still receiving Blue Water's assurances, APL was constantly communicating with agents of U.S. Customs during mid- to late- May to try to expedite the disposition of the cargo.   Further, APL complied with all of Customs' requests, including contacting the FDA agent in late May after Inspector Ybarra's supervisor so suggested and undertaking various (albeit unsuccessful) attempts to obtain a Letter of Abandonment from Blue Water.  In addition, when APL determined that the matter was not moving quickly enough under the supervision of Inspector Ybarra, APL not only contacted Inspector Ybarra's supervisor, but also involved the CMC, one of the top oversight offices in U.S. Customs.   These aggressive attempts to retrieve the containers are only logical, as APL loses money when containers sit on the pier because demurrage costs do not cover loss of revenue.

102.    APL's preference for selling the cargo – as opposed to only requesting destruction of the cargo – is further proof of APL's continued attempts to mitigate damages. APL made numerous attempts to try to expedite the sale of the cargo, including engaging a surveyor in late May to try to convince U.S. Customs that the cargo could be sold and consulting with Inspector Ybarra on various occasions to try to commence a quick sale process.   Further, Blue Water's assertion that potential buyers were limited because of anti-dumping duties is misguided, as APL's expert explained that purchasers of merchandise under the control of U.S. Customs only pay a fixed amount and are not required to calculate customs duties in their purchase.   Naturally, if APL

itself could have sold the cargo, it would have been able to recover some costs and relieve Blue Water of the obligation to pay full demurrage.

103.    While hindsight permits one to perhaps reason that APL could have made one more phone call or tried some other avenue, such as the one suggested by Blue Water, the test for whether APL properly mitigated its damages is not whether APL did what hindsight deems the most prudent course of action.  Instead, as stated above, the test is merely whether APL's actions were within the "range of reason."  Given all the efforts made by APL to expedite the disposition of the garlic, APL must be entitled to full recovery of the demurrage because its actions were well within the range of reason.

104.    This is simply not the case of a carrier being in the position to sell or destroy the cargo at its own behest and direction.  Here, once the cargo was in G.O. status, the whole panoply of government regulation and procedure controlled.  The delays here were caused, among other things, by a failure of the government officials to know the regulations (Inspector Ybarra) and the studied reluctance of the government's contract partner (Crescent) to do its assigned tasks promptly and efficiently.  It would be inappropriate to penalize an innocent party (APL) for the faults and omissions of U.S. Customs and Crescent.  APL was diligent, and even took extraordinary steps, to resolve this problem.

105.    Thus, this Court finds that APL acted within the "range of reason" for purposes of mitigation of damages and is entitled to the full amount of demurrage, totaling $402,700, along with the  $73,872.18 in other expenses, plus interest at a rate of 9 per cent per annum.

## ALTERNATIVE DEMURRAGE FINDINGS OF FACT[5]

*Blue Water Inaccurately Analyzed the Quick Sale / Destruction Process*

106.    Even if the Court were to accept Blue Water's analysis that APL should have requested a quick sale on the date the cargo was sent to G.O., Blue Water's analysis would nevertheless be incorrect because (1) Blue Water confuses a request for a quick sale with a request for destruction and (2) the facts of this case do not lend to a 2 – 3 week timeframe for disposition of the cargo, even assuming APL contacted U.S. Customs or the G.O. Warehouse on the day the garlic was initially sent to G.O.

107.    Blue Water states in ¶ 34 of its Conclusions of Law: "if APL had commenced reasonable steps to obtain disposition of the garlic at or shortly after the date the first containers went into GO on April 18, 2003, *the quick sale process* would have been completed and the first set of five containers *would have been destroyed* within 21 days, or by May 9, 2003." (emphasis added).

108.    A quick sale process is not for the destruction of cargo, but for the sale of cargo. There are certain steps that are involved in a quick sale process, including preparation of the CFs 5251 by the G.O. Warehouse, authorization by U.S. Customs, and approval of the cargo for sale by FDA (in the case of food) and EG&G. With respect to destruction, additional steps are involved, including preparation of the CFs 3499, approval of the destruction by U.S. Customs, in addition to the recommendation of EG&G for the destruction of the cargo, preparation and arrangements for the actual destruction (including arrangements with a destruction service,

---

[5] As is evident from the above, Plaintiffs respectfully submit that based on the law and the facts of this case, there should be no reduction in the APL demurrage claim. However, consistent with the Court's preliminary findings, should the Court determine a discount should be made, the following section is thus relevant.

coordinating dates, and the actual destruction, given the amount of containers in this case, took almost two weeks itself). Thus, Blue Water inappropriately merges the idea of a quick sale and destruction and considers the two to three week standard appropriate.

109. Blue Water's analysis also assumes that, had APL contacted U.S. Customs or Crescent on the G.O. date, Crescent would have immediately moved forward with the preparation of the CFs 5251 (as it is clear in this case that U.S. Customs would not accept these forms from the anyone else, including APL) and the matter would have been resolved in 2 – 3 weeks. The facts of this case demonstrate that such a scenario is unlikely. Indeed, even if APL contacted U.S. Customs or the G.O. Warehouse on the G.O. date, Crescent still would have battled U.S. Customs about who had to fill out the CFs 5251, the parties would still have had to wait until the FDA had an available date to inspect the cargo, EG&G would have to concur, Crescent and the G.O. Inspector still would have then argued over who had to fill out the CFs 3499, the arrangements would still have to have been made for the destruction and the cargo in each container still would have had to be destroyed, at a rate of three containers per day, until all the garlic was destroyed. There is no reason to assume, therefore, that it would have taken less than the three months it took (from May 19 until destruction in late August) to dispose of the garlic even if APL commenced the communications with U.S. Customs and the G.O. Warehouse on the G.O. date (on April 18), as suggested by Blue Water. Thus, even accepting Blue Water's conclusion that APL should have commenced its pressure to dispose of the garlic on the G.O. date – which does not follow the proper legal standard for mitigation of damages, conflicts with the information Blue Water itself was providing to APL during the relevant time and is presented with the benefit of hindsight – the entire

process would have, nevertheless, taken approximately 90 days – as opposed to the 21 days suggested by Blue Water.  This would result in a demurrage amount of $310,540.

110.    Accordingly, if Blue Water's analysis that additional phone calls or communications on or around the G.O. date would have made a difference with respect to mitigation of damages, APL would nevertheless at a minimum be entitled to $384,412.18 (comprised of $310,540 in demurrage plus $73,872,18 in other expenses) in damages plus interest.

**Pre-Judgment Interest**

111.    It is appropriate and customary that in admiralty matters, a successful plaintiff is entitled to an award of prejudgment interest.  *Interpol Ltd. v. Bernuth Agencies Inc.,* 959 F. Supp. 644, 651 (S.D.N.Y. 1997).  The rate of interest to be awarded is within the discretion of the Court.  *Id.*

112.   Nine percent interest is an appropriate rate for prejudgment interest because it is the statutory rate of interest in New York.  N.Y. C.P.L.R. § 5004 (2005). ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.").

113.   Admiralty cases in the Southern District of New York have found that the nine per cent rate based on the CPLR is appropriate in the maritime context.  *See Central Hudson Gas Elec. Corp. v. M/V Lunamar II,* 797 F. Supp. 1244, 1245 (S.D.N.Y. 1992), *aff'd,* 56 F.3d 359, 372 (2d Cir. 1995); *see also Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration,* 137 F.3d 94, 104 (2d Cir. 1998).

114.  In the context of the Chicken Claim, it is appropriate for the interest to run from the date of destruction until the date of this decision.  With respect to the Garlic Claim, it is appropriate for the interest to run from the last date of destruction of the garlic until the date of this decision.  Thus, this Court will award APL 9 per cent per annum in pre-judgment interest on the damages.  Plaintiffs are to prepare the post-judgment calculations of the damages as set forth herein within 10 days of this opinion.

Dated:   New York, New York
         January 5, 2007

Respectfully submitted,

HAIGHT GARDNER HOLLAND & KNIGHT
A Law Office of HOLLAND & KNIGHT LLP

James H. Hohenstein (JH 3285)
Jean M. DelColliano (JD 0584)
195 Broadway
New York, NY 10007

Attorneys for Plaintiffs
APL CO. PTE LTD and
AMERICAN PRESIDENT LINES

CERTIFICATE OF SERVICE

I hereby certify that on this 5 day of January, 2007, a copy of the foregoing was served by email and by United States mail on:

David Monroe
Galland, Kharasch, Greenberg, Fellman & Swirsky
Canal Square
1054  31st Street, NW
Washington DC 20007

Sandra Gale Behrle
Cooper, Brown & Behrle, P.C.
331 Madison Avenue
New York, New York 10017

Jean M. Del Colliano

# 4283337_v1

39