UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
APL CO. PTE LTD and
AMERICAN PRESIDENT LINES, LTD.,

                                         05 Civ. 3454(DFE)

                 Plaintiffs,
                                         This is an ECF case

        - against -
                                         OPINION AND ORDER

BLUE WATER SHIPPING U.S. INC.,

                 Defendant.
---------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

        At the end of the non-jury trial, I stated my preliminary
findings at Tr. 386-91.  I hereby issue my formal findings of
fact and conclusions of law.  I have reproduced the plaintiffs'
proposed Findings of Fact and Conclusions of Law to the extent
that I adopt them as my own.  Then I have used bold type to write
my other findings and conclusions.

### General Findings of Fact

        1.  APL Co. Pte Ltd was and is a corporation organized and
existing by virtue of the laws of the Republic of Singapore and
maintains a principal place of business at 456 Alexander Road
#06-00, Singapore 0511, Singapore.

        2.  American President Lines, Ltd. was and is a corporation
organized and existing by virtue of the laws of the State of
Delaware and maintains a principal place of business at 1111
Broadway, Oakland, California 94607.

        3.  Blue Water Shipping U.S. Inc. was and is a business
entity organized and existing under the laws of the State of
Delaware and maintains a principal place of business at Wall
Street Corporation Center, 27 West Street, Suite #9, Red Bank,
New Jersey 07701.

        4.  The terms and conditions for bills of lading issued by
APL Co. Pte Ltd and American President Lines, Ltd. (collectively,
"APL") include the following:

        Clause 1:
        'Merchant' includes the Shipper, Consignee, Receiver,

-1-

Holder of the Bill of Lading, Owner of the cargo
or Person entitled to the possession of the cargo
or having a present or future interest in the Goods
and the servants and agents of any of these, all of
whom shall be jointly and severally liable to the
Carrier for the payment of all Freight, and for the
performance of the obligations of any of them under
this Bill of Lading.

Clause 3:
The Merchant warrants that in agreeing to the Terms
and Conditions hereof, including the Applicable
Tariff(s), it is, or has the authority of, the
Person owning or entitled to the possession of the
Goods and/or Container and this Bill of Lading . . .

Clause 13(iii):
The Merchant shall comply with all regulations or
requirements of customs, port and other authorities,
and shall bear and pay all duties, taxes, fines,
imposts, expenses or losses (including, without
prejudice to the generality of the foregoing, the
full return Freight for the Goods if returned, or
if on-carried, the full Freight from the Port of
Discharge or the amended Place of Delivery)
incurred or suffered by reason of any failure to so
comply or by reason of any illegal, incorrect or
insufficient markup, numbering or addressing of the
Goods, and shall indemnify the Carrier in respect
of any such failure to comply or by reason of any
such marking, numbering or addressing of the Goods.

Clause 14(iii):
. . . All charges due hereunder together with
Freight . . . shall be due from and payable on
demand by the Merchant (who shall be jointly and
severally liable to the Carrier therefore) at such
port or place as the Carrier may require, Vessel
or cargo lost or not lost from any cause whatsoever.

Clause 21(iii):
If a place of Delivery is named on the face hereof,
the Merchant shall take delivery of the Goods
within the time provided for in the Carrier's
Applicable Tariff.  (See Clause 2).

Clause 21(iv):
If the delivery of the Goods is not taken by the

Merchant when and where the Carrier is entitled to
call upon the Merchant to take delivery thereof,
the Carrier shall be entitled, without notice, to
unpack the Goods . . . and store the Goods . . . .
and the costs of such storage. . . shall forthwith
upon demand be paid by the Merchant to the Carrier.

Clause 21(v):
If the Merchant fails to take delivery of the Goods
. . . or if in the opinion of the Carrier they are
likely to deteriorate, decay, become worthless or
incur charges . . ., the Carrier may . . . at the
sole risk and expense of the Merchant, sell, destroy
or dispose of the Goods . . .

Clause 21(ix):
The Merchant's attention is drawn to the stipulations
concerning free storage time and demurrage contained
in the Applicable Tariff.

(Exh. 36).

## General Findings of Law

5.  This is an admiralty action as provided in Rule 9(h) of
the Federal Rules of Civil Procedure.

6.  This Court has jurisdiction over the subject matter of
these claims under 28 U.S.C. § 1333.

## Findings of Fact **Specific to the Chicken Shipment**

7.  The chicken that forms the basis of the Chicken Claim
was owned by Cousins D&N, Inc. ("Cousins").  (Joint Pre-Trial
Stipulation of Facts ("Stipulated Facts") at ¶1).

8.  During the relevant time, Cousins was splitting into two
companies, Astra Group, Inc. ("Astra") and DGM Commodities
("DGM").  Certain Cousins' employees involved in the Chicken
Claim were later employed by Astra, which is the company that
became responsible for handling matters arising from the shipment
of the frozen chicken backs. [1]   (Stipulated Facts at ¶2).

---

[1]  Given the confusion over the precise time that Astra took over for
Cousins, "Cousins" should be read to mean "Cousins and/or Astra" unless
otherwise indicated.

9.   The chicken was originally shipped via CMA Lines from the United States to Russia in early 2002.  (Stipulated Facts at ¶3; Trial Transcript of Michael Plotkin ("Plotkin Tr.") [2] at 84: 20-22).

10.   While the frozen chicken backs were en route to Russia, the Russian authorities imposed a ban on such products **due to an outbreak of Avian Influenza in the state of the product's origin (Exh. 18),** so the shipment was delivered to the port of transloading in Hamburg, Germany.  (Stipulated Facts at ¶4; Plotkin Tr. at 84:18-25, 85:1).  **Up to this point, Blue Water and its affiliated persons and entities had no involvement of any kind in the shipment of these frozen chicken backs.**

11.   **Victor Sapp has been employed in the freight forwarding business since 1982.  He was employed in New York by Maritime Freight America from 1997 until May 2002.  During the latter part of that period, Maritime Freight America began acting as the U.S. agent for Blue Water Shipping International A/S ("International"), a Danish corporation engaged in freight forwarding.  On June 1, 2002, Mr. Sapp became employed by the defendant entity, Blue Water Shipping U.S. Inc. ("Blue Water), which had been incorporated in 1998 but had no employees or operations prior to June 1, 2002.  It obtained licenses from the Federal Maritime Commission to act as a freight forwarder and NVOCC in late October 2002, and began actively providing such services in early 2003.  International and Blue Water** shared the same parent company.  (Declaration of Victor Sapp ("Sapp Decl.") [3] at ¶¶2, 5-8).

12.   **In early 2002, while Mr. Sapp was still employed by Maritime Freight America, he received a call from Cousins about the shipment of frozen chicken backs that Cousins had exported from the U.S. to Russia in four containers.  Cousins explained that the shipment had been denied entry into Russia, and had to be diverted to Estonia.  Cousins had used another freight forwarder for that shipment, and not Maritime Freight America. But Cousins asked Mr. Sapp if he knew of a warehouse in Estonia capable of storing the chicken while Cousins would try to sell it to some other buyer.  Mr. Sapp contacted International, which**

---

[2]  All trial transcript citations will follow this format: "[Witness' Last Name] Tr. at [Page]: [Line]"

[3]  All citations to Declarations in Lieu of Direct Testimony will follow this format: "[Last Name] Decl. at ¶ __."

provided him with the name and contact information for Corvus Grupp Transport OU ("Corvus"), a company that operated a cold warehouse in Tallinn, Estonia.  Mr. Sapp passed that information to Cousins.  A short time later, Mr. Sapp passed some information back and forth between Cousins and International about getting the chicken into the Corvus warehouse.  However, Maritime Freight America and Sapp did not handle the transportation arrangements to move the chicken to Estonia.  (Sapp Decl. at ¶¶9-10.)  Corvus, which was also a freight forwarding organization, arranged for physical placement of the goods to the warehouse.  Once the shipment was in the warehouse and under the supervision of Corvus, Cousins spoke directly with Corvus and exchanged e-mails with Corvus.  (Plotkin Tr. 86:24-25, 87:1-8.)

13.  Mr. Sapp **left Maritime Freight America and** became Vice President of Blue Water on June 1, 2002.  **Blue Water's** President, Mr. Kurt Skov, **was an employee of Blue Water's holding company and his office was located** in Denmark, **and therefore** Mr. Sapp was the senior person in Blue Water's U.S. office.  (Sapp Tr. at 179:**1-25,** 180:1-7).

14-A.  **Estonian officials (including veternarian officials and customs officials) threatened that they would close Corvus's entire warehouse facility unless the frozen chicken backs were shipped out of Estonia promptly.  (Exh. 29.)  On August 7, 2002, Mr. Risto Koovit of Corvus e-mailed to Mr. Dan Nissen of International: "Still nothing?  We might receive order [from the Estonian government] to deliver cargo out [from] within Estonian limits with[in] 24 h[ours]!"  (Exh. 112, identical with Exh. F.)  On August 8, Mr. Nissen replied that he had talked with Cousins/Astra several times on August 7, but that Cousins/Astra "has let me down again."  (Ibid.)  Mr. Koovit promptly e-mailed to Mr. Nissen: "... So, I believe since no respond, we must start to plan returning of this stuff back to Origin in States?"  (Ibid.)  Mr. Nissen promptly forwarded this entire e-mail string to Mr. Plotkin at Cousins and to Mr. Sapp, along with his own warning that, unless the Estonian government granted another extension of time, Cousins should be prepared for the returning of the chicken to the U.S.:  "Risto, I will leave the decision up to you.  I do not want to get you into problems - - nor ourselves - - so if we can not get another extension, please make plannings as suggested.  Michael [Plotkin] - - rlc [?] - - please advise whether you have anything arranged [such as a sale to a new party that would get the chicken out of Estonia]."  (Ibid.)**

14-B.  At trial, in response to my questions, Mr. Plotkin did not dispute that he had received this chain of e-mails. (Plotkin Tr. 95:1-8.)  He gave the following testimony:

> [MR. PLOTKIN]: I remember that Mr. Nissen expressed the urgency of making some sort of a decision[,] to which we answered that we understand the urgency and decisions are in the process of being made.
>
> In other words, we were looking for where to move the cargo to.  And there was another alternative except for [aside from] pushing for that sale to Forex ... where we were also looking into the alternative of moving this cargo to Port Riga which nearby [in the] country of Latvia. ....
>
> THE COURT:  But, did you realize that if none of these alternatives actually happened that Corvus was planning to ship your chicken back to the United States?
>
> [MR. PLOTKIN]:  I did not realize that Corvus would do such a move without our consent[,] on their own.
>
>     *   *   *
>
> THE COURT:  And shortly after this September 5 e-mail [Exh. G] I gather MultiForex backed out of its contract with you?
>
> [MR. PLOTKIN]:  Yes.  ....

(Plotkin Tr. 95:13-21; 96:2-7; 98:10-13.)

14-C.  After waiting another two months, Corvus shipped the chicken to the United States; it left Estonia on November 8, 2002.  In the case at bar, the question is not whether Corvus had reason to believe that Mr. Plotkin had authorized Corvus to ship Cousin/Astra's chicken to the United States.  The question is whether the carrier (which has chosen not to sue Corvus) has proven that Mr. Sapp had reason to believe that Mr. Plotkin had not authorized Corvus to make that shipment.

14-D.  Plaintiffs' Proposed Finding of Fact #14 says:
"After Cousins' Mr. Plotkin read the email suggesting that the
cargo be sent to the United States, he called Mr. Sapp and
explained that such a suggestion was 'complete nonsense.'"  I am
not convinced that Mr. Plotkin communicated this to Mr. Sapp or
to Mr. Koovit, and I am not at all convinced that he communicated
to either of them, at any time between August 8 and November 29,
2002, that he was flatly refusing to authorize such a shipment.
In response to my questions, Mr. Plotkin acknowledged that there
is no e-mail or other document during that time period in which
he flatly rejected Mr. Koovit's written suggestion:

> THE COURT:  ... [W]hat was going to happen
> if there was no sale and the Estonian government
> was refusing to allow this product to be destroyed
> in Estonia and refusing to allow it to stay in
> Estonia?  In that event, Mr. Koovit of Corvus Group
> was saying [in writing] that the thing to do was to
> ship it back to the United States.
> My question to you is:  Do you have any
> documentation that you rejected that under all
> circumstances?  Even if you couldn't arrange a
> sale[,] you were absolutely refusing to have a
> shipment of this chicken back to the United States?
>
> [MR. PLOTKIN]:  I do not specifically remember
> of such a document right now, no.

(Plotkin Tr. 93:20-25; 94:1-5.)

15.  I reject Plaintiffs' Proposed Finding of Fact #15,
which says that Mr. Sapp "expressly agreed with Mr. Plotkin that
it would be 'complete nonsense' to try to import such cargo (Sapp
Tr. at 184:15-25) and he knew there would be 'troubles' when the
goods arrived in the United States.  (Sapp Tr. at 244:13-15)."
At Tr. 184:22-25, Mr. Sapp answered "Yes" to a confusing question
containing three negatives.  At Tr. 189:7-16, he clearly
testified that, prior to the time the bill of lading was issued,
he never had any conversation with Mr. Plotkin or Mr.
Tsitlishvili about the importation of frozen poultry into the
United States.  At Tr. 244:6-15, Plaintiffs' counsel twice tried
to get Mr. Sapp to admit that "you knew there was going to be a
problem when the goods arrived in the United States."  At Tr.
244:9, Mr. Sapp answered in the negative.  At Tr. 244:13-15, he
answered "we knew that there are troubles but ... Astra never

informed us what they wanted to do with the cargo."  I take that to mean that he knew there were "troubles" in Estonia; at Tr. 245:14-25 and 248:6-25, he testified that, prior to the issuance of the bill of lading, he did not know that there would be a problem when the goods arrived in the United States.

16.   Blue Water never received any instructions or authorization from Cousins to ship the frozen chicken backs to the U.S.  (Sapp Tr. at 207:24-25, 236:8-12).

17-A.  On October 28, 2002, Mr. Koovit e-mailed to Mr. Nissen that Corvus was "planning reloading earliest next week." He noted that the storage fees were mounting and that the total (including a small amount for "transit of containers port-warehouse-port") would be $11,908.30, and he estimated that the "cargo value" was less than that, and he expressed concern whether the storage fees would actually be paid by Cousins/Astra (a company with which he had no prior experience).  (Exh. H, pp. 00544-00545.)  Mr. Nissen replied that Cousins/Astra "have always kept their promises" and he was confident that Cousins/Astra would pay for the storage costs; he forwarded a copy to Mr. Sapp and asked him to "make sure that we get a cheque from Astra still today."  (Id., p. 00544.)  It appears to be undisputed that Cousins/Astra paid the $11,908.30, but I am not sure when.

17-B.  Corvus made the arrangements with Plaintiffs to ship the frozen chicken backs from Estonia to the United States.  On November 5, 2002, Mr. Koovit e-mailed to Mr. Nissen and notified him as follows:  "We have now agreed with line (APL) and Vet. dep that loading will [be] happening on Thursday and Friday with vessel departu[r]e from Tallinn on 8 [November, a Friday]."  Mr. Koovit also noted that the seafreight charge would be "4 x 3895 USD," and that Corvus would have to pay it within 7 days "as we do not enjoy any credit benefits with APL."  (Id., p. 00547.)  On November 6, Mr. Koovit e-mailed to Mr. Nissen and notified him that the four containers would sail to Bremerhaven, from where they would leave on a different ship on November 17, and would arrive in Charleston on November 29.  (Id., p. 00546.)  Mr. Nissen replied: "shall revert with transfer details of outstanding amounts, inclusive seafreight in due course." (Ibid.)

18.  It appears that Mr. Koovit obtained APL's form of Bill of Lading, typed in the information as a first draft, and faxed it to International with a handwritten note saying "Pls check and

confirm, regards, Risto." (Exh. 11.) At the top are three lines showing fax transmissions; the earliest one says November 13, which was five days after the ship Carina had already sailed from Estonia with the four containers of frozen chicken. In the blank for "Shipper" Mr. Koovit typed in Cousins. In the blank for "Consignee" he also typed in Cousins and its address but no telephone number. In the blank for "Notify Party" he originally typed in Blue Water Shipping US Inc. This draft Bill of Lading was faxed back by Christina Christensen of Blue Water International; in the blank for "Notify Party" she crossed out Blue Water Shipping US Inc. and wrote "Same as consignee" and she also wrote "Att: Risto, Please change! Christina." (Exh. 11.)

19. On November 15, 2002, Mr. Koovit e-mailed to Mr. Nissen. He said he was "a little bit paranoiac" about this change, because he believed that Cousins was an off-shore company with no telephone number. (It is possible that he was also worried that Cousins was morphing into Astra.) For the first time in the evidence, someone expressed a worry that Cousins/Astra might not claim the containers when they arrived in the U.S.; Mr. Koovit wrote: "[W]e both know that Cousins D&N is off shore company; mentioning also no telephone numbers or REAL contact data will leave us (Corvus) as only link to be contacted and charged for all additional costs later when those four containers [will be] arriving and nobody will collect them. Can you pls. guarantee that such scenario will never appear? Who shall [the APL] line contact when containers arriving, not me I presume?" (Exh. H, p. 00551.)

20. Mr. Nissen promptly responded that Cousins/Astra did have a telephone number in the U.S. His October 28 e-mail had assured Mr. Koovit that Cousins/Astra "has always kept their promises," and now he wrote: "I guarantee you, that you under no circumstances will be left with the problem. If Astra does act as we expect, we will take over." (Exh. H, p. 00551.) In my view, Mr. Nissen was assuming that Cousins/Astra had authorized shipment to the U.S. If nobody claimed the cargo, then APL's "additional costs" would be the primary liability of Cousins/Astra and the secondary liability of Corvus. International was willing to guarantee Corvus against the possibility that APL might be unable to collect those costs from Cousins/Astra. Mr. Nissen was confident that Cousins/Astra was not judgment-proof. His last sentence makes sense only if we add the word "not" - - "If Astra does not act as we expect, we will take over [i.e., International will indemnify Corvus]."

21.  Mr. Koovit apparently was relieved to learn that Cousins/Astra had a telephone number in the U.S.  He wrote: "pls send me [Astra's] phone number as [APL] line will then send it [the phone number] forward to states, to their agent over there for contacts."  (Exh. H, p. 00550.)  Mr. Nissen promptly sent him Astra's phone number.  (Ibid.)  On the night of November 15, Mr. Sapp put in his first comment, emphasizing that Corvus was the agent for the shipper (and hence Corvus's liability was secondary to Astra's):  "Risto, you can't be the part which is left behind. You [Corvus] are not mentioned on the b/l either and just in case APL insists on it you must put [']Corvus as agent of Astra Group Inc['] in as the shipper.  Also Astra is not an off shore company.  It is registered in the state of New York.  However, the holding company [of Astra] is off-shore but they are not mentioned on the paperwork."  (Ibid.)

22.  The actual bill of lading, in final form, was dated November 16, 2002.  (Exh. 12.)  On November 19, 2002, Mr. Koovit wrote:  "shall I send originals to Denmark or to States?"  (Exh. H, p. 00549.)  International told him to send them to Mr. Sapp (Id., p. 00548), but Mr. Sapp said to send him only a copy and to send the originals "straight to Astra."  (Ibid.)  I view this as some evidence that Mr. Sapp had a good-faith belief that Astra had authorized Mr. Koovit to ship the containers to the U.S. (Apparently Mr. Koovit did not send the originals to Astra, at least not promptly; the reason may be that he was "about to leave for a week long trip.")  (Id., p. 00549.)

23.  On or about November 30, 2002, the chicken arrived in Charleston, South Carolina.  APL notified Cousins of its arrival. Mr. Tsitlishvili and Mr. Plotkin expressed shock that their frozen chicken backs were not still sitting in Estonia.  They asserted that they had no prior knowledge of the carriage of the containers by APL.  (Plotkin Dep. at 20:7-18; Tsitlishvili Dep. at 14:16-25, 15:2-9).  If they had conceded knowledge, then their company would have been liable to APL for the costs of demurrage and destruction.  It is possible that Cousins/Astra possessed no prior knowledge of the shipment, and that Corvus arranged it with no authorization, and it is even possible that Corvus acted with intent to defraud Cousins/Astra and APL.  APL eventually chose to believe those latter alternatives, perhaps because Cousins/Astra was a large-volume customer.  APL chose not to sue Corvus, but rather Blue Water.  It seems to be undisputed that Cousins/Astra refused to reimburse Corvus for the ocean freight charges of $15,580.00.  Corvus sent an invoice to International for that

-10-

amount, dated November 8, 2002, but received on December 12, 2002.  (Exh. 10.)  In August 2003, Plaintiffs' counsel wrote that this invoice, "to our understanding, was paid by BWS [meaning International]."  (Exh. 30; see also Plaintiffs' Proposed Finding of Fact #38.)  I do not see evidence that Corvus was reimbursed for the $15,580.00.  If it was, perhaps International felt obligated by Mr. Nissen's e-mails to Corvus on October 28 (Astra "have always kept their promises") and November 15 ("I guarantee to you").  In any event, in the circumstances of this case, such a post-shipment reimbursement would not persuade me that "International was the true shipper" (as asserted in Plaintiffs' Proposed Finding of Fact #38).  Nor would it persuade me that Blue Water "assisted with the arrangements to ship the frozen chicken backs to the United States in early November" (as asserted in Plaintiffs' Proposed Finding of Fact #17).

        24.  On January 30, **2003,** Suzan Anderson-Ross of APL's Claims Department sent a letter to **Mr.** Plotkin and **Mr.** Sapp.  **The letter stated that APL's Estonia office has advised that the shipment from Estonia was arranged by Corvus Group (which the letter erroneously characterized as "partner of Blue Water Shipping").  The letter set forth Cousins' claim that it had not authorized this shipment.  The letter stated:  "USDA will be taking possession of these containers as soon as possible, as USDA and APL have been informed that no one has any interest in this shipment."**  (Exh. 17).

        25.  Mr. Plotkin responded the following day and attached a fully executed "Letter of Abandonment" disavowing ownership of the chicken.  **He wrote:  "After several months of storing this product, without any notification given to us, Corvus Group by themselves placed [the] booking with the APL ...."**  (Exh. 18).

        26.  Once APL received the Letter of Abandonment, APL commenced the process of arranging for the destruction of the cargo.  (Stephens Decl. at ¶¶8-9).  The USDA then issued an Emergency Action Notification ("EAN") authorizing destruction and APL then made all arrangements for the destruction of the cargo. (Stephens Decl. at ¶¶8-9; Exh. 20).

        27.  **On May 8, 2003, Ms. Anderson-Ross wrote again to Mr. Plotkin and Mr. Sapp.  She said:  "APL was put in the middle of this fiasco and has suffered monetary damages, and hold you liable.  You may decide between yourselves who will clear this debt as itemized, ...."  (Exh. 25.)  She enclosed a copy of the Mr. Koovit's first draft of the bill of lading, on which he had**

originally listed Blue Water as the "notify party" until International's Christina Christensen asked him to change this. Nevertheless, Mr. Sapp's reply of May 15, 2003 asserted that "you will easily see on the documentation Blue Water Shipping is not mentioned anywhere and was not involved." (Exh. 26.) APL then brought in Mr. Hohenstein as litigation counsel. On August 1, 2003, he faxed Mr. Sapp a letter (Exh. 30) and a copy of the e-mails between Corvus and International, including the e-mails by Mr. Sapp on November 15 and 19, 2002 (Exh. 28, at p. 00449 and p. 00451). On August 5, 2003, Mr. Sapp faxed a reply that included the following: "Certainly the warehouse, which has a clear order from [Estonian] customs, does not want to be kept responsible when cargo is rejected. This is the meaning of Mr. Nissen's letter [presumably referring to Mr. Nissen's November 15 e-mail to Corvus]. .... Again we refuse any responsibility or involvement in this case besides doing some last minutes advice to help the parties out." (Exh. 29.)

28. APL paid all expenses associated with the destruction, which totaled $10,758.13. This amount was comprised of the following: (1) $4,800 for trucking expenses to the Oakridge Landfill where the chicken was destroyed by deep burial **on February 28, 2003**; $600.00 for the Wrecker Service necessary for digging the hole and burying the chicken; and $5,358.13 to the Oakridge Landfill for the actual burial. (Pl. Exhs. 33, 34, 35; Anderson-Ross Decl. at ¶21(c)).

29. The applicable tariff rate for demurrage for the four containers holding the frozen chicken backs amounted to $133.00 each for the first four days and $159.00 each for every day thereafter. The total demurrage accumulated, therefore, was $54,280.00. (Exh. 32; Anderson-Ross Decl. at ¶21(b)).

## Conclusions of Law **Specific to the Chicken Shipment**

30-A. As to the shipment of chicken, the original Complaint named Cousins and Astra as additional defendants. They were served but did not file any answer or motion; however, on September 26, 2006, counsel confirmed to me that plaintiffs would not pursue Cousins or Astra, and therefore I removed them from the caption. (Docket Item #24.) Moreover, the plaintiffs never sued the Estonian company Corvus, even though Corvus had prepaid the freight charges and had listed Cousins as the Shipper on the bill of lading.

30-B.  On June 15, 2006, the attorneys for plaintiffs and for Blue Water spoke with my chambers and set a firm trial date of October 11, 2006.  I held the final pretrial conference by telephone on October 5, 2006.  Plaintiffs' counsel informed me that it wished to file an Amended Complaint adding a cause of action sounding in fraud.  Six days later, I put the following on the record:

> I have reviewed the amended complaint that was faxed to me on October 9, and we discussed that on October 5.  I am going to grant leave to the plaintiffs to file that amended complaint. I will assume that the new material is denied by the defense[.] [B]ut I do take seriously Mr. Monroe's argument that he was not advised that there was a possibility of a fraud claim with much higher damages and that if he had known that, he might have made attempts to depose the Estonian company Corvus.
>
> As I said in my telephone conference, I think the prejudice will be handled by the burden of proof[,] which is on the plaintiff[s] and very particularly in a fraud case.

(Tr. 2-3.)

30-C.  On the cause of action for breach of contract, plaintiffs' burden is easier, namely proof by a preponderance of the evidence.  However, I conclude that, even under the easier burden, plaintiffs have failed to prove that Blue Water has any liability as to the chicken shipment.  At the end of the trial, I expressed this at Tr. 386-87.  I shall now set forth what I said there; to express this more correctly, I have now made the alterations that are shown in brackets:

> ... [A]fter the chicken arrived in South Carolina, Mr. Sapp was throwing up a barrage of arguments[;] some of them, in my view[,] were weak and some of them were half-truths.  [See Exhs. 26, 29.]  And just [seven days after] the chicken [left] Estonia, there [we]re some statements by Mr. Sapp that raise a lot of questions as to exactly whether he realized that APL might be hurt.  [See Exh. H, pp. 00550.] But, I don't think that the plaintiffs have carried

their burden of proof on what I view as the most
important question [both on breach of contract and
on fraud, see Tr. 391], which is[:]  before the
chicken left Estonia did Mr. Sapp know that Cousins
was unaware of the shipment going back to the U.S.[?]
Maybe he did, maybe he didn't, but there is some
evidence that supports the idea that he did not know.
One is his e-mail to Corvus on November 19 [eleven
days after the chicken left Estonia] saying, send
the originals of the four bills of lading to Michael
Plotkin at Astra, and gave the [mailing address and]
phone number [Exh. H, p. 00548]. .... [T]he fact
that Mr. Sapp sent that e-mail is some evidence
that he was operating, perhaps[,] in good faith.

     It is also puzzling to me exactly what happened
here.  The record is not clear enough and we don't,
of course, have testimony from Corvus.  It may be
that Corvus was deliberately perpetrating a fraud on
APL.  I don't know that for sure.

     Corvus felt that they were under pressure.
Apparently Corvus paid thousands of dollars to [APL],
for the ocean freight from Estonia to Charleston,
but maybe they realized that that was the cheapest
way for them to solve their problem and maybe they
realized that it would create much more loss for APL.

     But I am just not sure, from the record in front
of me, and I am a little bit puzzled by the fact that
Cousins/Astra doesn't have documentation to really
back up its version.  Now, maybe there is a reason
for that.  I don't know.  But [Cousins/Astra] heard
at one point [in a September 5 e-mail, Exh. G] that
Corvus was saying the absolute deadline [when the
chicken must leave Estonia] is September 12[.] ...
[V]ery few days before [September 12] the contract
between [Cousins/]Astra and MultiForex fell through.
[Tr. 98.]  And, yet, it was another two months before the
chicken left Estonia.  And I just don't have a clear
idea what Cousins was saying to Corvus.  [Cousins]
had heard about the deadline and I just don't know
whether there was further communication or whether
at some point Cousins just sort of dropped the ball
and somehow expected Corvus to just hold this

-14-

chicken in Estonia for weeks and weeks and weeks
[past the September 12 deadline].

30-D.  Cousins/Astra claims that it was shocked when APL
notified it that the chicken had been transported back to the
United States.  In the end, however, Cousins/Astra's problem was
solved at little cost to Cousins/Astra.  It apparently paid
$11,908 for storage in Estonia for four months while it
unsuccessfully tried to find a non-Russian buyer; but it was
spared the cost of additional storage and/or destruction.
Moreover, Corvus paid $15,580 to APL for the ocean freight from
Estonia to the U.S.  In those circumstances, it is entirely
possible that Corvus had authorization from Cousins/Astra, or
reasonably believed that it did.  After the chicken left Estonia,
Corvus apparently asked Cousins/Astra to reimburse it for the
$15,580, and Cousins/Astra refused and asserted that it had not
authorized the shipment.  As best I can tell, Corvus first turned
to Cousins/Astra for reimbursement of the $15,580; after being
rebuffed, Corvus turned to International and sent them an invoice
on December 12, 2002.  This is Exh. 10 (its typewritten date is
Nov. 8, 2002, but a handwritten notation says "received on 12-12-
02," which was 12 days after the chicken arrived in South
Carolina).  Plaintiff's Proposed Finding of Fact #38 asserts that
"International reimbursed Corvus for the freight charges."  I see
no evidence of this.  If International did reimburse Corvus,
perhaps it felt obligated by Mr. Nissen's "guarantee" to Corvus.
Or perhaps International simply wanted to maintain good relations
with Corvus - - just as Plaintiff seems to want to maintain good
relations with Cousins/Astra, which is a frequent shipper.

31.  APL's bill of lading terms and conditions governed the
shipment of the frozen chicken backs **from Estonia** to the United
States.

32.  Under APL's bill of lading terms and conditions, a
"Merchant" is defined **to include "the Shipper" or the "Owner of
the cargo" and "the servants and agents of any of these, all of
whom shall be jointly and severally liable ... for the
performance of the obligations of any of them under this Bill of
Lading."**

33.  **APL's theory seems to be that Blue Water was an
undisclosed principal for Corvus.**  An undisclosed principal can
incur liability as a Shipper when it manipulates the system to
avoid liability.  *Solar Int'l Shipping Agency, Inc. v. Eastern*

-15-

*Proteins Export, Inc.*, 778 F.2d 922, 925 (2d Cir. 1985). **But the evidence before me has not made out a case remotely like the *Solar* case cited by APL.**

34. **See the colloquy at Tr. 211-215. I accept Blue Water's explanation that it lost its copies of the e-mails prior to the filing of this lawsuit when its main server crashed. Accordingly, I decline to draw any adverse inference against Blue Water because of its** failure to produce any emails or any print out of any email or other communication evidencing Blue Water's attempts to inform Cousins of the shipment. **On the other hand, I conclude that Mr. Sapp's recollection was mistaken at Tr. 192-93 where he testified that he sent such an e-mail to Cousins, passing on the information he received in Exh. 8 on November 6 that the chicken would leave Estonia on November 8 and would arrive in the U.S. on or about November 29. However, Blue Water did not have a duty to notify Cousins. I do not find that Blue Water had reason to believe that Cousins had not authorized shipment of its chicken to the U.S. At Tr. 93-94, Mr. Plotkin acknowledged that Cousins/Astra has no documentation to show that it rejected Corvus's written suggestion of "returning this stuff back to Origin in States." (Exh. 112, identical to Exh. F.)**

35 through 42. **I reject Plaintiff's Proposed Findings of Fact #35 through #42. Accordingly, with respect to the chicken shipment, I will enter judgment in favor of Defendant on the cause of action for breach of contract.**

43. Under New Jersey law (given Blue Water's location in that state, it is the appropriate law to apply), a claim for fraudulent inducement requires (1) that a defendant make a knowing representation of a material fact; (2) with the intention to induce the plaintiff to rely on the misrepresentation; (3) that the plaintiff actually relies on the misrepresentation; and (4) that the plaintiff incur actual damages as a result of its reliance. *Gutman v. Howard Savings Bank*, 748 F. Supp. 254, 257 (D.N.J. 1990).

44. To establish **the alternative** cause of action **(for fraud)**, APL was required to prove the elements by clear and convincing evidence. While Mr. Sapp's conduct **raises some questions**, the Court finds that APL has not met this difficult burden. As such, judgment will be entered for Blue Water on this claim.

<u>Findings of Fact</u> **Specific to the Garlic Shipments**

45.  In March and April 2003, 29 containers of fresh garlic were shipped aboard four different vessels, the M/V Mokihana, the M/V President Wilson, the M/V Mokihana, and the M/V Manoa, from China to the United States.  (Stipulated Facts at ¶¶31-35).

46.  APL was the ocean carrier for the shipments of garlic and the goods were shipped pursuant to APL's bills of lading.  (Stipulated Facts at ¶¶31-35; Exh. 37).

47.  Blue Water was the NVOCC with respect to the shipments of 29 containers of garlic.  (Sapp Dep. at 153:20-23; Day Tr. at 338:7-13).

48.  Akata Food Trading, Inc. ("Akata") was the ultimate consignee of the goods and was Blue Water's customer.  (Sapp Dep. at 40:3-10; Xu Dep. at 89:2-6; Exh. 37).

49.  Both House Bills of Lading and Master Bills of Lading were generated for each shipment of garlic.  On every House Bill of Lading (issued by Blue Water), Huaiyang Hongda Dehydrated Vegetable Company ("Huaiyang") was listed as the Shipper and Akata was listed as the Consignee and Notify Party.  (Stipulated Facts ¶¶38, 39).

50.  On every Master Bill of Lading (issued by APL), with one exception, OEC Logistics (Qingdao) Co. ("OEC") was listed as the Shipper, and Blue Water was listed as the Consignee and Notify Party.  With respect to bill of lading APLU 025753738, the Shipper is listed as "Huaiyang Hongda Dehydrated Vegetable Company, on behalf of OEC Logistics (Qingdao) Co., Ltd."  The Consignee and Notify Party for APLU 025753738 are both listed as "Akata Food Trading Inc. on behalf of Blue Water Shipping U.S., Inc."  (Stipulated Facts ¶40).  **OEC booked and prepaid the freight charges for each of the garlic shipments.  (Stipulated Facts ¶41; Sapp Tr. 253:3-5).**

51.  The shipments of garlic arrived in California on the following dates:  the containers on the M/V MOKIHANA arrived on March 31, 2003; the containers on the M/V PRESIDENT WILSON arrived on April 1, 2003; the containers on the M/V MOKIHANA arrived on April 16, 2003 and the containers on the M/V MANOA arrived on April 22, 2003.  (Stipulated Facts ¶¶32-35).  APL notified Blue Water of the arrival of the shipments and provided

courtesy shipment status updates concerning the cargo.  (Exhs. 39, 46).

52.   If a customer does not pick up the containers within a fixed amount of time, demurrage starts to accrue.  (Powers Tr. at 77:16-19).  Demurrage is intended to cover the fixed costs incurred by the terminal (APL) for upkeep of the containers, including monitoring, maintenance and electricity costs.  (Powers Tr. at 78:1-3).  Demurrage does not include any lost revenue incurred by APL for not having the containers available for further commercial use.  (Powers Tr. at 78:5-9).  **As a generalization,** APL is better off if its containers are promptly picked up so that the containers (especially refrigerated containers as here) can be returned to revenue-generating activities.

53.   When the shipments of garlic arrived in the United States, they were assessed by U.S. Customs at 376.76% Anti-Dumping Duties.  (Stipulated Facts ¶45).  While the consignee would need to pay this duty when it claims its cargo, a subsequent purchaser is unaffected by this duty if the goods are sold by U.S. Customs at a quick sale.  (Day Tr. 356:4-25, 357:1-11).  **As for the proceeds of a quick sale, "they first pay ... the expenses of the auction, then they pay something else, then they pay the customs duty, then they pay the lien holders.  And if there is not enough money to pay everybody, then they pay proportionately."  (Day. Tr. 357:7-11).**

54.   The USDA and the FDA placed a number of holds on the shipments as well.  While most of the holds were removed within a matter of days, two holds remained on **five** containers under bill of lading numbers APLU 025753771 and APL 025753775 until June 3, 2003.  (**Exh. 44 p. 00088 and p. 00096;** Exh. 85 **p.** 00742; Exh. 89 **p.** 00766).

55.   When the cargo did not clear Customs within 15 days, Mark Porter, APL's Customs Compliance Clerk, sent the required general order ("G.O.") Notifications to U.S. Customs and **to** Crescent Warehouse Company, Ltd. ("Crescent"), a local customs G.O. bonded storage facility, though notifications **as to 12 containers** were sent **on April 25 although due on April 21.** (Exh. 44; **Day Tr. 331-333**).  With these G.O. Notifications, Mr. Porter attached a letter requesting the assignment of a constructive G.O. number.  Mr. Porter included this request because, as he explained in the letter, the commodity was fresh garlic and, since the G.O. Warehouse did not have freezer capacity, nor was there any bonded cold storage facility in the

Los Angeles area, the garlic had to remain in APL's refrigerated or "reefer" containers. (Exh. 44, e.g., APL 00085; Porter Decl. ¶10; Ewers Dep. at 15:16-18, 17:8-15). In addition, Mr. Porter called U.S. Customs at this time to advise that he was sending over the requests for the assignment of constructive G.O. (Porter Decl. at ¶14).

56. As requested by Mr. Porter in his G.O. Notifications to Crescent and U.S. Customs, the cargo was thus placed in "constructive G.O." and remained in APL's reefer containers pending the disposition of the cargo at Customs's direction. (Expert Report of John Day ("Day Report") p. 5). Once goods have been placed in G.O. status, whether at a G.O. warehouse or constructively with a carrier, those goods are under Customs's control. (Day Report pp. 2-3).

57. **On April 21, 2003, Blue Water's Frank Xu sent APL a fax concerning the first five containers, which had arrived in California on March 31:**

> **We are aware of that above shipment are now on d[e]murrage since 4/8/03; up to now US Customs still not cleared yet.**
> **We are informed by our customer [Akata] and their broker ... that they are trying to clear it ASAP now. And it is expected to be done early this week.**
> **Please give them [a] few more days for it, before the c[o]nt[aine]rs be sent to G.O.**

**(Exh. 49). In fact, APL had already "sent" those five containers into G.O. status on April 18. Eventually, APL placed all 29 containers into G.O. status. On or about May 5, for reasons that are unclear, 3 of those containers went off demurrage and were transported onward, apparently to New York or Miami. (See Exh. 58 p. 00256; Exh. 69; Exh. 99 p. 00886.)**

58. **Exhibit 55 contains five e-mails on May 7, 2003 (a Wednesday). APL's Liam Powers e-mailed to Mr. Xu:**

> **The problem with the containers on the west coast is getting worse.**
> **The [26 containers associated with 12 bills of lading listed] below have been sitting for over 30 days and have nearly $75,000 in demurrage due.**
> **This is to inform you that we are about to**

> start the process of sending the containers to
> G.O. for auctioning of the product.
>      Please advise if you or your customer is
> going to pay for these and pick them up by Friday.
> ....

Contrary to Plaintiffs' Proposed Finding of Fact #58, Blue Water
did not give "assurances" to APL.  Instead, Mr. Xu replied:

> I finally get in touch with AKATA, and
> was told that their lawyer is working on this
> case now.  He asked whether we can give him
> some extra time for finishing the mess.

Mr. Powers's reply convinces me that APL realized as of May 7 (if
not earlier) that it was extremely unlikely that Akata would pick
up this cargo.  Mr. Powers wrote back to Mr. Xu:

> I don[']t think we can give anymore time
> past Friday.  We are already in for $75,000.
>      Do you have a copy of one of the invoices
> for the product?  I need to know what the product
> is worth.
>      I gotta believe that $75,000 is their profit
> [on all the cargo in these 26 containers] and
> is there any reason that they will even pick it up
> if it is not worth it to them. ....

Mr. Xu promptly replied: "I don't have the invoices of these.
And I agree with your idea."  Mr. Powers finished this e-mail
string by stating that "Frida[y] is the last day."

     59.  It should have been clear to APL that Mr. Xu was having
difficulty getting information from Akata.  Mr. Xu had told Mr.
Powers "I agree with your idea," which was "auctioning of the
product."  I find that, no later that Friday May 9, 2003, APL
should have clearly and forcefully asked the G.O. Warehouse and
U.S. Customs to authorize a "quick sale."  Exh. 50, especially
the portion from May 5 through May 19, shows delay caused by APL
because several of its employees, including Marilyn Kennedy, May
Tang and Mark Porter, were apparently unaware of the "quick sale"
procedure.  At trial, APL's expert witness testified that the
"quick sale" procedure takes a total of two to three weeks, and
that there is no requirement for a letter of abandonment.  (Day
Tr. 335:13-25, 336:1-18.)  However, after 10 days of unnecessary

**delay, Mark Porter, who had been a G.O. Customs Compliance Clerk for APL since 1998, e-mailed on May 19, 2003 to Mr. Powers (with copies to more than 15 other APL employees): "If a 'letter of abandonment' can be presented to the Customs Inspector, 'maybe' they would allow APL to salvage/destroy or the G.O. whse to auction off this cargo before the 6 mo. typically required by the regs. Does anyone think this might be possible? I can ask Inspector Ybarra if you want?"** On May 19, Mark Porter **belatedly** contacted Inspector Rachel S. Ybarra of U.S. Customs to see how APL could work within the customs regulations to dispose of the cargo. **Later that day, Mr. Porter e-mailed to Mr. Powers: "I just spoke w/ Inspector Ybarra, she advises cargo must remain intact w/seals for the 6 mos required, if these do not clear customs." (Exh. 50, p. 00300.) Any such advice would have been erroneous. Having read Ms. Ybarra's deposition, I am unsure whether she actually gave such advice. It may be that Mr. Porter misunderstood her answer to a poorly-framed question that did not clearly ask about a quick sale.**

60. **On May 21, 2003, Mr. Porter reported that he had spoken again to Ms. Ybarra and that he** tried to express the urgency of the matter by referring to the refrigerated containers and explaining how much demurrage would accrue if APL maintained the cargo in its containers for six months. **He reported that "she advises that under 19 CFR sec 4.37E does not allow cargo to be moved to cold storage. Also, since it is under constructive G.O. it is to be held on dock until 6 months."** (Exh. 59 APL 00369, Porter Decl. at ¶¶13-14).

61. When this second call with U.S. Customs failed to generate helpful results, Mr. Porter contacted (that same day) Kris Stephens of APL's Customs Compliance Group for assistance. (Porter Decl. at ¶¶13-14; Exh. 59 **p.** 00369) The next day, May 22, Ms. Stephens contacted Inspector Ybarra's supervisor. The supervisor, however, was unavailable, so Ms. Stephens left a message concerning the containers. As Ms. Stephens was leaving for vacation shortly thereafter, she left the name and number of her colleague, Kelly Reynolds, so the communications with U.S. Customs could continue without delay. (Stephens Tr. at 152:19-25, 153:1-17; Exhs. 50 **p.** 00295, 59 **p.** 00378).

62. In response to Ms. Stephens's call, the supervisor inspector called Ms. Reynolds the following day (May 23). In the message, the supervisor inspector left the FDA's telephone number for APL to contact. (Exh. 50 **pp.** 00287-00288).

63. Ms. Reynolds advised Ms. Stephens that she not only called the supervisor back that same day but she also attempted to call the FDA agent 3 or 4 times. (Stephens Tr. at 164:1-24; Exh. 50 **pp.** 00287-00288).

64. Around this time, Suzan Anderson-Ross of APL engaged a surveyor to assess the condition of the garlic and a survey was conducted on May 23. APL's purpose in arranging for this survey was, assuming the garlic was still saleable, APL could use the survey "to convince U.S. Customs to act quickly, as fresh garlic is a perishable commodity." (Anderson-Ross Decl. at ¶29; Exh. 58). **The surveyor's report said that he examined three containers, one from each of three ships. The garlic in a container that had been loaded in China on 3/8/03 was "slightly soft" but the garlic was "firm" in two containers that had been loaded on 3/15/03 and 4/5/03. In all three containers, "[p]eeling the cloves reveals the garlic is still in good condition." (Exh. 58; this report is undated and contains a June 9 market quote, but I assume that the surveyor gave its client APL a prompt oral report on May 23 concerning the "good condition.") It is unclear to me whether APL conveyed that "good condition" report to the G.O. Warehouse and to U.S. Customs (and, if so, when).**

65. **On May 22, 2003, on behalf of Blue Water, Mr. Sapp sent APL a letter of subrogation. (Exh. 61.) On May 27, he e-mailed to Mr. Powers, urging APL to "get the stuff in[to] an auction ASAP." (Exh. 64.) APL contends that** Blue Water never even provided a legitimate letter of abandonment; **however, APL's expert testified that no letter of abandonment is required for a quick sale. (Day Tr. 336:3-18.)**

66. **In an internal e-mail on June 5, 2003, Mr. Porter made clear that Inspector Ybarra was no longer giving him the impression that the garlic would have to remain on the dock for six months.** During a call on June 5, Inspector Ybarra finally advised APL that a quick sale procedure could be used to dispose of the merchandise. (Exh. 51 **p.** 00829)

67. As the disposition process was now in motion, Mr. Porter and Inspector Ybarra spoke again a few days later, on June 11. (Exh. 108, Exh. 72 **p.** 00898). During this call, Inspector Ybarra informed Mr. Porter that the FDA **"has decided to do an inspection of all the containers"** and would then make the determination as to whether the cargo could be sold or whether it had to be destroyed. (Exh. 72 **p.** 00898). Indeed, even if APL

would have preferred to immediately destroy the cargo at this time, it could not have done so until the examination of the cargo and the recommendation for destruction by EG&G. (Ybarra Dep. at 78:13-15). EG&G is a company under contract with Customs: this company is involved in all disposition of goods under Customs's jurisdiction and control. (Day Report p. 2-3).

68. Inspector Ybarra further advised Mr. Porter on June 11 that **"he needed to call Cindy Ewers [of Crescent] to send me the documentation, if he wanted to do a quick sale on this merchandise."** (Ybarra Dep. at 71:2-8). Mr. Porter **did not call Ms. Ewers; he** forwarded a fax to Ms. Ewers that same day (June 11). Its second page listed 21 containers. Its first page said: **"Due to the perishable nature of the cargo currently under constructive G.O. Apl is requesting the form 5251 to be filled out so the cargo can be sold or destroyed and the reefer containers can be returned to inventory as soon as possible."** (Exh. 70 **p.** 00865.) **Mr. Porter testified that, in his opinion, this fax's language expressed urgency**. (Porter Tr. at 143:5-18). **However, he conceded that he didn't check back with Ms. Ewers; he testified that "she had to contact U.S. Customs and so I just got back into my regular job ...." (Porter Tr. at 142:10-14.)**

69. When Cindy Ewers of Crescent received the June 11th letter, she understood that "APL wanted their equipment back." (Ewers Dep. at 36:16-23). **This fax letter did not enclose a form 5251 (Id. at 31:13-15), and it did not specifically state who should fill out the form, but Ms. Ewers realized (apparently right away) that APL was "asking me to fill out the 5251 document" (Id. at 33:22).** Yet Ms. Ewers did not believe she had to fill out the forms for constructive G.O. cargo. (Ewers Dep. at 18:16-21). Thus, there was a delay in the process as Ms. Ewers consulted with U.S. Customs as to whether she had to fill out the forms. (Ewers Dep. at 34:7-18, 38:11-14). Once Ms. Ewers reluctantly agreed that U.S. Customs would only accept the CFs 5251 from the G.O. Warehouse, she prepared the forms and sent them to U.S. Customs on June 23, **twelve days** after Mr. Porter's request. (Ewers Dep. at 18:16-25, 19:1-5; Ybarra Dep. at 71:3-11; Exhs. 71, 75, 76). **I primarily blame Ms. Ewers for this portion of the delays, but I also blame Mr. Porter and APL for not pushing her.**

70. During this time, Inspector Ybarra was working with the FDA to make sure that the cargo could be sold or, alternatively, whether it would have to be destroyed per recommendation of the FDA. (Ybarra Dep. at 70:13-21, 71:12-23). **On or before June 26,**

**Ms. Ybarra "and [FDA] Inspector Layhe went down to APL's docks, and we looked at the cargo. He took a sample to his lab. And then he notified me later that this merchandise was not fit for human consumption." (Ybarra Dep. at 71:15-19.) That deposition testimony seems to be saying that the June "sample" was a limited one, perhaps from only one container. The record does not make clear whether the June sample was garlic that had been loaded in China on March 8, or March 15, or April 5. (Compare Exh. 58, describing the May 23 survey.) To summarize, all of the garlic had been in good condition on May 23 but, by June 26, at least one container was no longer salable. On June 26, in an internal e-mail, Mr. Porter wrote: "More bad news, Inspector Ybarra has called Cindy at the G.O. warehouse and told her the FDA has said this cargo 'can not be sold'. So it will have to be destroyed." (Exh. PPPP, used as Depo. Exh. 169 at Ybarra Dep. 70.)**

71.  **The FDA's June "sample" was apparently a limited one, perhaps taken from only one container. A more thorough inspection was required before Customs would authorize destroying the cargo in all 26 containers. During some period between June 26 and July 11,** APL was also contacting the FDA to apply extra pressure so the matter could be resolved promptly. (Exh. 72 **pp.** 00897-**00898**; Stephens Tr. at 159:14-25, 160:1-20).

72.  **The FDA's more thorough inspection occurred on** July 16, 2003 because that was the date the FDA inspector was available. (Ybarra Dep. at 75:16-24). On the following day, the FDA issued **a letter stating** its determination that the cargo was not saleable. **For some reason, another seven days elapsed before July 24, when** EG&G **sent Inspector Ybarra a form letter that** recommended that **the cargo** be destroyed. (Exhs. 74, 77; Ybarra Dep. at 71:15-19, 99:21-25, 100:1-7; Stephens Decl. at ¶15). As explained by Inspector Ybarra, the cargo could not be destroyed before this recommendation from EG&G. (Ybarra Dep. at 78:13-15).

73.  Inspector Ybarra thereafter instructed Ms. Ewers to prepare the necessary CFs 3499 (Application and Approval to Manipulate, Examine, Sample or Transfer Goods) so the garlic could be destroyed in accordance with EG&G's recommendation. (Ewers Dep. at 51:22-23). Again, however, there was a dispute between Crescent's Ms. Ewers and Inspector Ybarra as to whether Ms. Ewers (as opposed to APL) had to prepare the forms. Inspector Ybarra again insisted that only Ms. Ewers could prepare the CFs 3499. (Ewers Dep. at 52:24-25). The matter was further delayed because Inspector Ybarra rejected the CFs 3499 **two** times because Ms. Ewers had filled the forms out improperly. It took

Ms. Ewers three attempts to prepare the forms before U.S. Customs would accept them, which it did on August 11, 2003. (Exh. 78; Ybarra Dep. at 82:13-18, 83:2-25, 84:1-2, 10-13).

74. The garlic was destroyed, at the expense of APL, between August 13 and August 25, 2003. Specifically, the garlic in the following **26** containers was destroyed on the following days:

TRLU1844615, destroyed August 13, 2003,
APLU6930396, destroyed August 13, 2003,
APLU6935546, destroyed August 13, 2003,
CRLU9102771, destroyed August 14, 2003,
APLU6935931, destroyed August 14, 2003,
APLU6944975, destroyed August 14, 2003,
TRLU1922390, destroyed August 15, 2003,
APRU5020834, destroyed August 15, 2003,
APLU5993960, destroyed August 15, 2003,
GCEU7742013, destroyed August 18, 2003,
CRLU5110378, destroyed August 18, 2003,
TRLU1949405, destroyed August 18, 2003,
APRU5028012, destroyed August 19, 2003,
CRLU5109361, destroyed August 19, 2003,
APLU6934452, destroyed August 19, 2003,
APRU5031525, destroyed August 20, 2003,
APLU6915452, destroyed August 20, 2003,
APRU5042751, destroyed August 20, 2003,
APLU6948224, destroyed August 21, 2003,
TRLU1946622, destroyed August 21, 2003,
TRLU1949257, destroyed August 21, 2003,
APLU6932090, destroyed August 22, 2003,
APLU5986050, destroyed August 22, 2003,
APLU6945267, destroyed August 22, 2003,
APLU6912495, destroyed August 25, 2003,
APLU6947444, destroyed August 25, 2003.
(Stipulated Facts at ¶62).

75. **APL's Proposed Finding of Fact #75 states:** "The garlic in containers APLU599345, APLU6914332, and CRLU513008 was sold on August 22, 2003 in Miami, Florida. (Exh. 91 p. 00778)." **Those container numbers correspond to three containers on which APL seeks $3,660.00 for demurrage from April 25 to May 5, 2003. (Exh. 99 p. 00886; Exh. 100.) At the end of this Opinion, I will direct APL to explain whether it received any of the proceeds from the sale of the garlic from these three containers and, if so, why Blue Water should not receive a credit to the extent of such proceeds.**

76.  The Applicable Tariff rate for the shipment of fresh garlic was $100.00 for the first four days and $120.00 for each day thereafter.  (Exh. 102, Anderson-Ross Decl. at ¶31(c)).

77.  APL's **claim for** damages for the garlic **shipments totals** $474,072.18 in expenses.  **This is** comprised of $402,700.00 in demurrage for the 29 containers, $2,600 for the L.A. Marine survey of the cargo in May 2003, $425.00 for Marine Surveyors of the cargo prior to its destruction, $62,192.18 for the destruction costs, and $6,155.00 for outstanding miscellaneous items, including $80.00 for documentation handling, $1,500.00 for expenses relating to diversion costs, $2,075.00 for charges incurred from the USDA Tailgate / 2% Tailgate Inspection Fees and $2,500.00 in outstanding shipping and handling costs.  (Pl. Exhs. 58, 97, 98, 99, 100, 101, and 102; Anderson-Ross Decl. at ¶31).

**General Order and the Quick Sale Procedure**

78.  Once unclaimed cargo has not cleared customs within 15 days, the cargo is eligible for G.O.  (Day Report p. 2).  Once in G.O., the cargo is under the custody and control of U.S. Customs. (Brauner Tr. 369:7-8; Day Report p. 7).  If the G.O. merchandise is perishable, the customs regulations provide that it can be auctioned by a quick sale.  (Day Report pp. 2-3).

79.  A quick sale is a process by which special merchandise can be sold under the authority of U.S. Customs at an accelerated rate given its perishable nature.  (Day Report p. 2).  As explained by APL's expert on U.S. Customs:

> A quick sale is accomplished by the G.O. Warehouse notifying U.S. Customs and the sale contractor, EG&G, that special merchandise has been received in the G.O. Warehouse. EG&G conducts an appraisal of the merchandise which, depending on the nature of the goods, may include participation by U.S. Customs or other governmental agencies.  For example, USDA or FDA generally are involved when the merchandise is comprised of perishable food.  Once EG&G has made its appraisal and advised whether the merchandise is "saleable", the U.S. Customs port director must either approve the sale of merchandise or order the destruction of unsaleable goods before the merchandise can be disposed.

> If the goods are considered saleable, the G.O. Warehouse prepares the CF 5251, which notifies involved

parties that the goods are scheduled for sale or destruction
on a specific date. A three day public notice of sale of
perishable merchandise is then made and the sale is
conducted by EG&G, the same company that appraised the
goods.

(Day Report pp. 2-3) (citations omitted).

  80. A carrier cannot unilaterally arrange for a quick sale
without the cooperation and authorization of U.S. Customs and the
other relevant governmental entities. (Porter Tr. at 135:10-14).
Indeed, it is not the carrier that is to request the quick sale
initially, but the G.O. Warehouse. (Day Report p. 2; Brauner Tr.
366:17-22; Ybarra Dep. at 64:22-25, 65:1-8).

  81. A quick sale cannot take place until an appraisal is
conducted by EG&G. (Day Report pp. 2-3; Ybarra Dep. at 65:5-7).
Moreover, even after EG&G advises that merchandise is saleable,
the G.O. Warehouse must then prepare the necessary forms (the CFs
5251) and then the sale must then be approved by U.S. Customs.
(Day Report p. 3; Ybarra Dep. at 65:12-18, Day Tr. 336:10-14).
The carrier does not conduct the sale, the sale must be conducted
by EG&G. (Day Report p. 3).

  82. The entire quick sale process typically takes two to
three weeks if the G.O. Warehouse and U.S. Customs are properly
carrying out their respective responsibilities and the
appropriate regulations. (Day Tr. 335:13-24).

  83. If merchandise is sold by quick sale, the purchaser
does not need to pay any customs duties, such as anti-dumping
duties, that have been imposed on the product. (Day Tr. 356:4-
25, 357:1-11).

  84. If merchandise under Customs' jurisdiction must be
destroyed, the G.O. Warehouse needs to prepare a separate form,
i.e., a CF 3499 (Application and Approval to Manipulate, Examine,
Sample or Transfer Goods). (Day Report p. 3). The Customs' port
director will then need to approve the CF 3499 before the
merchandise can be destroyed. (Day Report p. 3; Day Tr. 336:19-
25).

## Conclusions of Law Specific to the Garlic Shipments

## Liability

  **85. APL may have been unable to serve process upon Akata**

**Foods. APL seeks to impose liability against Blue Water as an NVOCC. It may well be that Blue Water will seek indemnification from the two Chinese companies. (See Exh. 69.)** An NVOCC is defined, by statute, as "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier." 46 USCA App. § 1702(17)(B), *see also Ultimo Cabinet Corp. v. M/V Mason Lyes*, No. 90 Civ. 2748, 1991 U.S. Dist. LEXIS 581, at *4, 1991 AMC 1343, 1345 (S.D.N.Y. January 17, 1991). An NVOCC is statutorily distinguishable from a freight forwarder because the latter is defined as only "dispatch[ing] shipments *from* the United States," as opposed to shipments that are destined for the United States. 46 USCA App. § 1702(17)(A)(i). This Court finds that Blue Water was an NVOCC with respect to the shipments of garlic.

86. Under APL's bill of lading terms and conditions, the definition of a "Merchant" includes a Shipper. As an NVOCC, Blue Water is considered, by statute, a shipper in its relationship with APL. Therefore, Blue Water qualifies as a Merchant under APL's bill of lading and is subject to and bound by APL's bill of lading terms and conditions.

87. Typically House Bills of Lading are issued as the contractual agreement between the NVOCC and the cargo owner, while Master Bills of Lading represent the contractual agreement between the NVOCC and the carrier. *All Pacific Trading Inc. v. Hanjin Container Line, Inc.*, 7 F.3d 1427, 1430 (9th Cir. 1993). Thus, the MBL was the contractual agreement governing the relationship between APL and Blue Water.

88. On the MBLs, Blue Water is listed as the Consignee and Notify Party. Further, under the APL's bill of lading terms and conditions, a Merchant is defined as, among other things a "consignee" or "receiver." Thus, Blue Water is a "Merchant" subject to and bound by APL's bill of lading terms and conditions.

89. Clause 14(iii) of the APL bill of lading specifically states that all those defined as a "Merchant" shall be jointly and severally liable to the carrier for all charges due under the bill of lading together with freight.

90. Under Clauses 21(iii), (iv), and (ix) of APL's bill of lading, the Merchant is required to take delivery of the goods, and any costs or expense resulting from a failure to do so are the responsibility of the Merchant. Thus, Blue Water, as a Merchant, is liable to APL for the costs and expenses resulting

from the Merchant's failure to take delivery of the goods.

**Damages**

    91.  While Blue Water is liable to APL as a Merchant under APL's bill of lading terms and conditions, APL had a duty to mitigate its damages by taking the necessary steps to dispose of the garlic. *See, e.g., Dankrag Ltd. v. Intern. Terminal Operating Co.*, 729 F. Supp. 360, 365 (S.D.N.Y. 1990).

    92.  **Blue Water does not dispute that** expenses **were** incurred by APL in the amount of $73,872.18, **including $62,192.18 for the destruction of the garlic in 26 containers.  Blue Water offers to pay for all of those expenses, but only in conjunction with a theory that all of the garlic could have been destroyed by May 21, 2003, thus drastically reducing the demurrage expenses.** (Blue Water's Proposed Conclusion of Law #36).

    93.  The burden of proving whether APL failed to mitigate its damages rests on Blue Water.  *Fortis Corporate Ins. v. M/V CIELO DEL CANADA*, 320 F. Supp. 2d 95, 106 (S.D.N.Y. 2004) ("the burden lies on the party challenging the mitigation efforts undertaken to show that they were unreasonable") (citations omitted).

    94.  Blue Water suggests that APL should only recover demurrage up until three weeks after each shipment was sent to G.O.  **(Blue Water's Proposed Conclusion of Law #30.)**  Blue Water bases this analysis on John Day's testimony that the quick sale process, which typically takes two to three weeks, should have been commenced by the G.O. Warehouse on the day the cargo was initially sent to G.O., i.e., April 18.  **(Day Tr. 308:5-9, 316:15-24, 334:18-22.)**

    95.  **In hindsight, it would have been best for all concerned if the G.O. Warehouse had commenced the quick sale process on April 18.  However, I conclude that it was only on May 9 that it became unreasonable for APL to delay a demand to the G.O. Warehouse and to U.S. Customs to commence a process to sell or destroy the cargo.  (See *supra,* ¶¶57-59.)**

*Legal Standard for Mitigation of Damages*

    96.  The duty to mitigate can apply in full force when a party exercises control over the damage that it is trying to avoid.  *Vulcanite Roofing Co. v. Steamship Turret Crown*, 1927 AMC 1460, 1464 (S.D.N.Y. July 15, 1927) (holding that a shipowner

could not be required to mitigate damages when it did not have possession or control over the goods); *In re Mirant Corp.*, 332 B.R. 139, 146-47 (Bankr. N.D.Tex. 2005) (finding that debtors could not be required to mitigate damages when they lacked control over the transportation capacity of pipeline energy).

97.   APL had physical possession of the garlic, **but** U.S. Customs and the G.O. Warehouse were the parties that **had primary** control over the cargo. **To mitigate its damages, APL was obliged to act reasonably promptly and reasonably persistently** to apply pressure on the appropriate authorities, such as U.S. Customs and the G.O. Warehouse, to encourage them to comply with their respective responsibilities and duties.

98.   In recogni**tion** that APL's only option for mitigating damages was to encourage others to act, the test applied to APL's efforts is not whether it took every conceivable effort to force others to comply with their duties, or whether APL tried every avenue of communication with them that, with the benefit of hindsight, might seem more appropriate.  Indeed, "[t]he rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party."  *Id.* (citing *Sunpride (Cape) (Pty) Ltd. v. Mediterranean Shipping Co., S.A.*, No. 01 Civ. 3493 (CSH), 2003 U.S. Dist. LEXIS 20333, at *37 (S.D.N.Y. Nov. 12, 2003) (quoting *In re Kellet Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950)).  Instead, the test for mitigation of damages is whether a party's actions were within the "range of reason."  As Judge Friendly explained:

> [I]f the plaintiff takes such action within the
> range of reason, the defendant is liable for
> further damages resulting therefrom. . . . It is
> not fatal to recovery that one course of action,
> reasonably open but not followed, would have
> avoided further injury whereas another, also
> reasonable and taken, produced it.

*Ellerman Lines, Ltd. v. President Harding*, 288 F.2d 288, 290 (2d Cir. 1961).  Thus, APL's efforts to encourage others to comply with their respective duties must be outside the "range of reason" in order for Blue Water to prevail on the argument that APL failed to mitigate its damages.

99.   **Blue Water has persuaded me that** APL's actions were **not** within the "range of reason" **in certain respects.**

100.  **At the end of the trial, at Tr. 388, I stated that APL "did not act with reasonable dispatch to push everybody to arrange for either sale or destruction."  I said that this "will limit their damages," but that I did not know "exactly where" I would "draw that line."  After reviewing the record and the post-trial submissions, I blame APL for three unreasonable delays.**

101.  <u>First</u>.  **APL unreasonably delayed from May 9 to May 19, 2003, in failing to ask the G.O. Warehouse and U.S. Customs to authorize a quick sale.  (See *supra*, ¶¶58-59.)  On May 19, APL's Mr. Porter belatedly contacted Customs, but he failed to ask clearly for a "quick sale."  Also, he should have contacted the G.O. Warehouse.  <u>Second</u>.  APL unreasonably delayed from May 9 to June 11 before asking the G.O. Warehouse to fill out the necessary forms and submit them to Customs.  (*See supra*, ¶¶65-68.)  <u>Third</u>.  Particularly after June 5, APL failed to pressure the G.O. Warehouse and Customs.  Mr. Porter waited until June 11 to contact the G.O. Warehouse, and then he didn't check back or follow up; he testified that the G.O. Warehouse "had to contact U.S. Customs and so I just got back into my regular job ...."  (Porter Tr. at 142:10-14.)  It turned out that the G.O. Warehouse delayed 12 days until June 23 before submitting the forms to Customs.  As I said at ¶69 *supra*, I primarily blame Ms. Ewers for this portion of the delays, but I also blame Mr. Porter and APL for not pushing her.**

102.  **If APL had acted reasonably, it would have notified both Customs and the G.O. Warehouse no later than May 9, and it would have clearly and specifically asked for a "quick sale," and it would have actively pressured them at a time when the garlic was in good condition.  In that event, I find it likely that Customs and the G.O. Warehouse would have carried out their responsibilities within the normal time frame described by APL's own expert (two to three weeks), and the "quick sale" would have been completed no later than May 30.  The May 23 survey showed that all of the garlic was in good condition (Exh. 58), and I infer that it was still in salable condition on May 30.  A "quick sale" in that time frame would have ended the demurrage charges, and would have eliminated the prospect of disposal costs.  (In addition, a "quick sale" might well have produced substantial offsetting revenue, but Blue Water has not submitted evidence sufficient to estimate such revenue.)**

103.  **On the other hand, even if APL had exerted reasonable pressure, there is a possibility that Customs and/or the G.O.**

Warehouse would have caused some delay beyond the normal time frame.  If the quick sale were delayed much beyond May 30, then the condition of at least some of the garlic would have approached the unsalable condition that was noted on June 26 in at least one container.  (See *supra,* ¶70.)  In that event, at least some of the garlic would need to have been destroyed.  Contrary to Blue Water's Proposed Conclusion of Law #34, such destruction would not have occurred "immediately."  With respect to destruction, additional steps are involved, including preparation of the CFs 3499, approval of the destruction by U.S. Customs, in addition to the recommendation of EG&G for the destruction of the cargo, preparation and arrangements for the actual destruction (including arrangements with a destruction service, coordinating dates, **plus time for** the actual destruction).  **The pace of the destruction process managed to destroy (or bury) the contents of only three containers per business day.  (See *supra,* ¶74; and Exh. 72.)**

104.  In sum, I find that, if APL had acted within the range of reason, it is likely that Customs and the G.O. Warehouse would have carried out their responsibilities within the normal time frame described by APL's own expert (two to three weeks), and the "quick sale" would have been completed no later than May 30, 2003.  On the other hand, even if APL had exerted reasonable pressure, there is a possibility that Customs and/or the G.O. Warehouse would have caused some delay beyond the normal time frame.  I resolve this as follows.  I hold Blue Water liable for the demurrage charges through June 7, 2003, plus $8,755.00 (representing the $2,600.00 spent on the May 2003 survey, and the $6,155.00 spent on the miscellaneous expenses).  I find Blue Water not liable for the $425.00 spent on the August 2003 survey, and not liable for the $62,192.18 spent on the August 2003 disposal.

## Pre-Judgment Interest

105.  It is appropriate and customary that in admiralty matters, a successful plaintiff is entitled to an award of pre-judgment interest.  *Interpol Ltd. v. Bernuth Agencies Inc.*, 959 F. Supp. 644, 651 (S.D.N.Y. 1997).  The rate of interest to be awarded is within the discretion of the Court.  *Id.*

106.  **APL argues for the rate set forth in New York's C.P.L.R. §5004, nine percent per annum.  Blue Water argues for the average interest rate paid on six-month U.S. Treasury bills.  As I did in a previous admiralty case, I award "pre-judgment**

interest at the adjusted prime rate, compounded annually." *Union Carbide Corp. v. M/T ENCOUNTER*, 2004 WL 548457, *8 (S.D.N.Y. Mar. 18, 2004) (citing cases). I direct that this pre-judgment interest shall run from June 7, 2003.

107. On or before March 14, 2008, APL shall serve and file detailed calculations of (a) the demurrage charges through June 7, 2003, and (b) running from June 7, 2003 through March 14, 2008, the pre-judgment interest (on the combination of the demurrage charges and the $8,755.00).

108. The detailed calculation of the demurrage charges should clarify what I believe to be the case: APL will be claiming demurrage totaling $3,660.00 for the 3 containers that are listed on the first page (p. 00886) of Exh. 99, and APL will be claiming demurrage through June 7, 2003 on the 26 other containers (see the next 26 pages of Exh. 99). (See also Exh. 100.) APL must also explain whether it received any of the proceeds from the sale of the garlic from 3 containers as described in ¶75 supra and, if so, why Blue Water should not receive a credit to the extent of such proceeds.

DOUGLAS F. EATON
United States Magistrate Judge

Dated: New York, New York
February 28, 2008

Copies of this Opinion and Order are being sent by electronic case filing to:

James H. Hohenstein, Esq.
Jean M. DelColliano, Esq.
HAIGHT GARDNER HOLLAND & KNIGHT
A Law Office of HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10017

David Monroe, Esq.
Galland, Kharasch, Greenberg, Fellman & Swirsky
Canal Square
1054 31st Street, NW
Washington DC 20007

Sandra Gale Behrle, Esq.
Cooper, Brown & Behrle, P.C.
331 Madison Avenue
New York, NY 10017